IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SARAH BRYAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-494 (RDA/LRV) |
| | ) | |
| INOVA HEALTH CARE SERVICES, d/b/a INOVA HEALTH SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Inova Health System's Motion for Summary Judgment (Dkt. 36) (the "MSJ"), *pro se* Plaintiff Sarah Bryan's Motion for Leave to File Corrected Opposition (Dkt. 45), Plaintiff's Motion for Leave to Supplement (Dkt. 48), Plaintiff's Motion for Leave to File Cross-Motion for Summary Judgment (Dkt. 51), Plaintiff's Motion for Leave to File First Amended Complaint (Dkt. 56), Magistrate Judge Lindsey R. Vaala's Report and Recommendation (Dkt. 64) (the "R&R"), Plaintiff's Objection to the R&R (Dkt. 66) (the "Objection"), Plaintiff's Notice of Final Posture and Motion to Remand (Dkt. 73), and Plaintiff's Motion for Leave to file a Second Amended Complaint (Dkt. 78). The Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions, the respective Oppositions thereto, and Replies in support, the Court DENIES Plaintiff's Motions and GRANTS Defendant's MSJ.[1]

[1] Except with respect to citations to deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

## I. PROCEDURAL BACKGROUND

On March 20, 2025, Plaintiff filed her Complaint. Dkt. 1. On May 20, 2025, Defendant filed an Answer. Dkt. 13. On May 22, 2025, a Scheduling Order issued. Dkt. 17. On June 18, 2026, the parties appeared before Judge Vaala for an initial pretrial conference and, thereafter, Judge Vaala issued her Rule 16(b) Scheduling Order. Dkt. 21.

On July 16, 2025, Plaintiff moved for partial summary judgment. Dkt. 26. Defendant then moved to strike. Dkt. 28.

On October 24, 2025, Defendant moved for summary judgment and opposed Plaintiff's motion. Dkts. 36, 39. On November 12, 2025, Plaintiff opposed Defendant's MSJ. Dkt. 40. The next day, the Court issued a notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1974). Dkt. 41 (the "Notice"). On November 18, 2025, Defendant filed its Reply. Dkt. 42.

On November 19, 2025, Plaintiff moved to withdraw her motion for partial summary judgment. Dkt. 43.

On December 5, 2025, Defendant filed a Motion for Leave to Supplement the Summary Judgment Record. Dkt. 48. On December 10, 2025, Defendant filed its Opposition. Dkt. 50.

On January 15, 2026, Plaintiff filed a Motion for Leave to File a Cross-Motion for Summary Judgment. Dkt. 51. On January 22, 2026, Defendant filed its Opposition. Dkt. 54.

On February 17, 2026, Plaintiff filed a Motion for Leave to file an Amended Complaint. Dkt. 56 (the "First Motion to Amend"). On February 25, 2026, Defendant filed its Opposition. Dkt. 60. On March 3, 2026, Plaintiff filed her Reply. Dkt. 62. On March 6, 2026, Judge Vaala held a hearing on the motion. Dkt. 63. On March 17, 2026, Judge Vaala issued her R&R. Dkt. 64. On March 30, 2026, Plaintiff filed her Objection to the R&R. Dkt. 66.

On April 17, 2026, Plaintiff filed her Notice of Withdrawal of her ADA claim. Dkt. 74. On April 20, 2026, Plaintiff filed her Notice of Final Posture and for Remand. Dkt. 73. On April 22, 2026, Defendant filed its Opposition. Dkt. 76. On April 24, 2026, Plaintiff filed her Reply. Dkt. 77.

On July 19, 2026, Plaintiff filed her Second Motion for Leave to file an Amended Complaint. Dkt. 78. On July 24, 2026, Defendant filed its Opposition. Dkt. 79. On July 27, 2026, Plaintiff filed her Reply. Dkt. 80.[2]

## II. THE MOTIONS TO AMEND AND RELATED ISSUES

Before addressing the MSJ, the Court must first address the outstanding motions to amend, which could impact the Court's resolution of the MSJ. The Court notes that Plaintiff's original Complaint asserted three claims: discrimination in violation of the Americans with Disabilities Act (the "ADA"), (Count I); ADA retaliation, (Count II); and violations of the Virginia Human Rights Act ("VHRA") (Count III). Dkt. 1. Her allegations largely relate to her "constructive termination" on December 1, 2023. *Id.* at 16. Bearing this in mind, the Court addresses each of the motions related to the amendment in order.

### A. The First Motion to Amend

In her First Motion to Amend, Plaintiff reports that she seeks to amend her Complaint to add a claim under the Age Discrimination in Employment Act (the "ADEA") and to request a

---

[2] The Court recognizes that the parties' motions have been pending for a longer period than is ordinarily expected in this District. The Court notes that this Division has been inundated with hundreds of habeas applications each of which requires expeditious review and each of which involves an individual in custody who desires release. Indeed, to date, more than ***3000*** civil cases have been filed in the Alexandria Division alone. Nor does the Court's regular civil and criminal dockets stop progressing forward to take account of this new influx of cases and this District Judge has personally presided over eight criminal trials in the last year. The Court has addressed this case in due course.

"Forensic Audit of Defendant's accommodation records." Dkt. 56 at 1. She asserts that the basis for amendment is newly discovered evidence regarding similarly situated comparators and that the amendment should be considered timely under equitable tolling. *Id.* In her R&R, Judge Vaala thoroughly addressed the First Motion to Amend. Dkt. 64. In particular, Judge Vaala noted that the First Motion to Amend was filed 130 days after discovery closed and 91 days after Defendant's summary judgment motion was ripe for consideration. *Id.* at 2. Because the proposed amendment would add new claims, Judge Vaala noted that permitting amendment would require reopening discovery. *Id.* at 4. Judge Vaala recommended that amendment should be denied because the First Motion to Amend is untimely, prejudicial, and futile. *Id.* at 5-7. Plaintiff objected to the R&R. Dkt. 66.

Pursuant to Federal Rule of Civil Procedure 72(a), a non-dispositive ruling of a Magistrate Judge may only be reversed where it is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). As district courts have sensibly recognized, "altering a magistrate judge's non-dispositive orders is extremely difficult to justify." *CertusView Techs., LLC v. S&N Locating Servs., LLC*, 107 F. Supp. 3d 500, 504 (E.D. Va. 2015) (internal quotation marks and brackets omitted). A magistrate judge's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). "An order is contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Philpott v. Va. Dep't of Transp.*, 2022 WL 3359361, at *1 (W.D. Va. Aug. 15, 2022). "The 'contrary to law' standard ordinarily suggests a plenary review of legal determinations, but many courts have noted that decisions of a magistrate judge concerning discovery disputes . . . should be afforded 'great deference.'" *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 470 (E.D.

Va. 2010). Numerous district judges within this Circuit have determined that "[t]he weight of authority within the Fourth Circuit suggests that a district judges should review a magistrate judge's denial of a motion to amend under the clear error standard of review." *Peraton, Inc. v. Raytheon Co.*, 2018 WL 10436095, at *1 (E.D. Va. Feb. 14, 2018); *see also Everett v. Cherry*, 671 F. Supp. 2d 819 (E.D. Va. 2009), *aff'd*, 412 F. App'x 604 (4th Cir. 2011) (recognizing that the clearly erroneous standard applies to Rule 72 objections regarding motions to amend a pleading); *Stonecrest Partners, LLC v. Bank of Hampton Roads*, 770 F. Supp. 2d 778, 783 (E.D.N.C. 2011) (collecting cases from other districts in the Fourth Circuit).

Plaintiff attacks each basis for Judge Vaala's R&R and, in each case, Plaintiff is incorrect. *First*, Judge Vaala correctly determined that the First Motion to Amend was untimely. Plaintiff's Objection only further demonstrates Plaintiff's lack of diligence. Plaintiff had attempted to rely on the consent decree entered in *EEOC v. Northern Virginia Surgical Center*, No. 1:24-cv-01721 (E.D. Va. Jan. 2025) (the "*NVSC* Case") as new evidence to support her claims. Dkt. 66 at 2. But Plaintiff acknowledges that she knew of the decree in January 2025 *before* she filed this case. *Id.* Plaintiff further concedes that she did not pursue further discovery related to that matter before the close of discovery. *Id.* Plaintiff claims she abstained based on her understanding of the parent-subsidiary relationship between Defendant and the *NVSC* Case defendant. *Id.* Additionally, Plaintiff's claims ring hollow where an October 6, 2025 email between defense counsel and Plaintiff explicitly discusses those corporate relationships *prior to the close of discovery*. Dkt. 68-1 ("Inova may be one of many shareholders of NVSC, but NVSC is a separate legal entity . . . ."). Yet, Plaintiff waited months to file the First Motion to Amend. Accordingly, Plaintiff did not act

diligently, and Judge Vaala appropriately found that Plaintiff's First Motion to Amend, to the extent it was premised on the consent decree, was untimely.[3]

Plaintiff also premises her First Motion to Amend (and her Objection to the R&R) on information regarding a potential ADEA comparator not being available until January 2026. Plaintiff concedes that she was aware of the person whom she now contends is an ADEA comparator (Rebecca Guerra) by at least July 2025 – well before discovery closed. Dkt. 66 (conceding "Plaintiff was aware of at least one potential comparator (Ms. Guerra, whom she had observed only once in person)"); Dkt. 27-7 (Plaintiff's submission of the grant of accommodations to Guerra). Plaintiff alleges that she did not, however, know Guerra's age. But she does not explain why she did not seek discovery in this regard. Accordingly, to the extent that the First Motion to Amend is premised on Guerra, it is untimely.

Permitting amendment at the time that Plaintiff first moved would also have been unduly prejudicial to Defendant. "A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party . . . ." *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). There, the Fourth Circuit found "compelling the court's analysis that the amendment—coming so belatedly—would change the nature of the litigation and, would therefore, prejudice [defendant]." *Id.* at 604. So too here. The addition of a new basis for discrimination would change the nature of the litigation, require additional discovery,[4] and

---

[3] A review of the consent decree in the *NVSC* Case further supports that it does not provide a basis for amendment here. The decree itself states that it was not an adjudication on the merits of the claims raised there. *See NVSC* Case, Dkt. 11 at 2. And there is no allegation that Northern Virginia Surgical Center ("NVSC") bears any relationship to Plaintiff and it is the only party governed by the decree.

[4] Even if Plaintiff did not desire to conduct discovery in this regard, discovery would still need to be reopened to permit Defendant to defend itself in this regard.

prejudice Defendant. *See Advanced Training Grp. Worldwide, Inc. v. Pro-Active Techs., Inc.*, 2023 WL 8945846, at *4 (4th Cir. Dec. 28, 2023) ("We have previously stated that a district court does not abuse its discretion in denying leave to amend when the amendment would add a new legal theory to the case after the close of discovery."). Accordingly, this is another basis on which the First Motion to Amend is denied, as Judge Vaala correctly decided.

It is also correct that Plaintiff's proposed amendments would be futile. Although Plaintiff now asserts that Guerra had the same director and human resources partner as herself (Dkt. 66 at 4), her proposed amended complaint does not include such allegations (Dkt. 56-1 ¶¶ 51, 71, 90). Moreover, Plaintiff concedes that she did not exhaust her administrative remedies with respect to her proposed ADEA claim. This too is fatal to her proposed amendments. Her ADEA claim is a new theory of liability that was not examined in discovery and is not reasonable related to her other (exhausted) claims. *See Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) ("For example, the plaintiff's claim generally will be barred if his charge alleges discrimination on one basis—such as race—and he introduces another basis in formal litigation—such as sex.").

Accordingly, the Court adopts and approves of Judge Vaala's R&R, overrules Plaintiff's Objection, and will deny the First Motion to Amend as untimely, prejudicial to Defendant, and futile.[5]

B. Second Amended Complaint and Remand

In the past several months, Plaintiff has filed a number of motions seeking to avoid federal jurisdiction. On April 17, 2026, Plaintiff filed a Notice of Withdrawal of her ADA claims. Dkt.

[5] Even assuming that Rule 72(b) applied to the review of the R&R (which it does not), the Court would reach the same conclusion under a *de novo* review.

74.[6] A few days later, on April 20, 2026, Plaintiff filed her Notice of Final Posture and Motion to Remand. Dkt. 73 ("Motion to Remand"). After that matter was fully briefed, Plaintiff filed her Motion for Leave to File Second Amended Complaint. Dkt. 78.

As an initial matter, the Motion to Remand will be denied. Plaintiff originally filed this matter in federal court. "Federal district courts do not have the authority to remand an action originally commenced in federal court . . . to a state tribunal." *Schiffman v. Epstein*, 2009 WL 1787760, at *5 (S.D.N.Y. June 23, 2009). Indeed, the idea of a remand is to send a case "back to the court or tribunal *from which it came*." BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). Here, there is no other court to which to remand this case because it originated in this Court. Accordingly, the Motion to Remand is denied.

Next, the Court addresses Plaintiff's Motion for Leave to File Second Amended Complaint. Dkt. 78 ("Second Motion to Amend"). Plaintiff asserts that she seeks to amend in order to "streamline this litigation and pursue the dispute exclusively under Virginia law." *Id.* at 2. Plaintiff attaches a proposed complaint that "eliminates all federal claims," asserts that complete diversity does not exist, and argues that the Court should decline to exercise supplemental jurisdiction. *Id.* at 4. Whether Plaintiff's Second Motion to Amend is framed as pursuant to Rule

[6] As Plaintiff later acknowledged, a notice is not the procedurally proper method to amend a complaint at this late date. Since the notice is not a motion and is not the procedurally proper vehicle, the Court does not separately address the notice. Regardless, however, the resolution of the notice would be the same as the Second Motion to Amend.

41 or Rule 15,[7] Plaintiff's Second Motion to Amend will be denied.[8] Where a party seeks to dismiss a federal claim following the close of discovery and after summary judgment has been filed, the Fourth Circuit has recognized that a district court does not abuse its discretion in denying a motion to amend to eliminate the federal claim and to proceed in state court. *See Miller*, 114 F. App'x at 540; *Davis v. USX Corp.*, 819 F.2d 1270, 1274 (4th Cir. 1987) (noting parenthetically that "denial of voluntary dismissal is appropriate where summary judgment is imminent"). Here, Plaintiff's motion is untimely, prejudicial to Defendant, and would waste judicial resources. *Id.*

Plaintiff's Second Motion to Amend is untimely as it came well after the close of discovery and well after briefing on the MSJ had been completed. Not only was it untimely, but it appears to be a reaction to Judge Vaala's R&R, coming only one month after Judge Vaala recommended that Plaintiff's First Motion to Amend be denied. *Contrast* Dkt. 64 (recommending denial of amendment on March 17, 2026) *with* Dkts. 69, 72, 73 (seeking to eliminate subject matter jurisdiction in April 2026). As courts in this Circuit recognize, "[a]fter the parties have conducted discovery and a pending summary judgment motion has been fully briefed, the court should be strongly disinclined to grant leave to amend, particularly where no good cause can be shown for the delay." *Witt v. Am. Trucking Ass'n*, 860 F. Supp. 295, 305 (D.S.C. 1994) (internal quotation

---

[7] Under Rule 41, the Court considers factors such as "the opposing party's effort and expense in preparing for trial, excessive delay and lack of diligence on the part of the movant, and insufficient explanation of the need for a voluntary dismissal" as well as the "present stage of litigation." *Miller v. Terramite Corp.*, 114 F. App'x 536, 539 (4th Cir. 2004). Under Rule 15, the Court considered "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [and] futility of amendment." *Id.*

[8] To the extent that Plaintiff suggests that she "has consistently sought to litigate these claims under Virginia law since the inception of removal," (Dkt. 78 at 4), she is factually and legally wrong. Although Plaintiff's VHRA claims proceed under Virginia law, Plaintiff has always asserted her claims in *this* forum and there was *no* removal.

marks and brackets omitted). Plaintiff offers no reason for the delay in seeking this amendment. Indeed, Plaintiff appears to believe that the only relevant delay is the time between when she first filed her notice and when she filed the Second Motion to Amend. Not so. The relevant delay is waiting until after discovery and after the submissions of summary judgment briefing to seek dismissal of a claim for purposes of proceeding in state court. Plaintiff offers no explanation in this regard.

Plaintiff's suggestion that Defendant will suffer no prejudice by permitting amendment is also mistaken. Defendant has already expended resources briefing matters in this Court and a state court proceeding would not pick up where this Court left off. Indeed, Plaintiff would file a *new* state complaint with whatever state claims she chose to bring. Defendant would then have to answer and, to the extent Plaintiff's allegations in that case differed from the allegations here, additional discovery would be required. The parties may also engage in new motions practice, which would be different from the MSJ filed here because it is before a different court and therefore subject to different rules of procedure. Defendant has provided evidence regarding the significant expenses it has already incurred in defending this action. Dkt. 76-1. The Fourth Circuit has similarly recognized that these are not the kind of circumstances in which leave to amend would be required. *See Skinner v. First Am. Bank of Va.*, 1995 WL 507264, at *3 (4th Cir. Aug. 28, 1995) ("On the other hand, the only apparent effect of the amendment on the Skinners would have been to permit them to dismiss their federal claim and thereby avoid an adverse ruling in federal court. We do not believe that this is the type of circumstance in which the grant of leave to amend was required."). Accordingly, the Second Motion to Amend is likewise denied.

## III. THE MOTIONS RELATED TO SUMMARY JUDGMENT

Now that the Court has determined that the MSJ is appropriately proceeding before this Court and that amendment is not suitable, the Court must address the motions related to summary judgment before addressing the MSJ itself. First, the Court considers Plaintiff's Motion for Leave to file Corrected Memorandum. Dkt. 45 ("Motion to Correct"). In the Motion to Correct, Plaintiff notes that she received this Court's *Roseboro* notice after she had filed her Opposition to the MSJ. *Id.* The only thing that Plaintiff indicates she intended to correct is the exceeding of the page limits for the Brief in Opposition. *Id.* at 1 ("Plaintiff asks leave of the Honorable Court to file a corrected brief that complies with the page limit and includes the required Statement of Genuine Issues under Local Rule 56(B) as a separate exhibit . . . ."). But Plaintiff's proposed correction would not comply with the Local Rules in any event. Local Rule 56(B) provides: "Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed." Thus, the Local Rules do not permit parties to separately file their statement of facts. *See Foosaner v. Crown Castle USA, Inc.*, 2024 WL 3298450, at *1 (E.D. Va. Apr. 9, 2024) (noting that courts within this District have recognized that the Local Rules "specifically requires each party's statement of relevant facts to be contained within that party's brief"). In any event, Defendant never sought to strike the excessive pages from the Opposition, and the Court will consider the Opposition in its entirety. Accordingly, Plaintiff's Motion to Correct based on her misunderstanding of the page limitations will be denied.[9]

[9] Although Plaintiff mentions receipt of the *Roseboro* notice in her Motion to Correct, Plaintiff does not actually base her motion on any of the information contained therein. Moreover, the Court's *Roseboro* notice explicitly provided Plaintiff with permission to file a response

Next, Plaintiff has also moved for leave to supplement the summary judgment record. Dkt. 48 ("Motion to Supplement"). Plaintiff seeks leave to supplement the summary judgment record with "newly discovered material evidence." Dkt. 48 at 1. The alleged newly discovered evidence that Plaintiff seeks to supplement consists of "archived cloud-based text messages" in which Plaintiff was a participant. *Id.* Plaintiff reports that she discovered the messages on November 21, 2025. *Id.* Although Plaintiff conclusorily asserts that she engaged in "diligent efforts," she neither explains what those efforts were nor explains how she "unexpectedly discovered these archived messages while reviewing her records." *Id.* at 2. Moreover, Plaintiff again conclusorily asserts that the text messages create genuine issues of fact as to the interactive process, but it is unclear how. *Id.* Nor does Plaintiff explain why such messages were not included in her Rule 26 disclosures.

Pursuant to Rule 37(c)(1), if "a party fails to provide information . . . required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether a nondisclosure is harmless a court has "broad discretion" and should examine: (i) the surprise to the party against whom the evidence would be offered; (ii) the ability of the party to cure the surprise; (iii) the extent to which allowing the evidence would disrupt the trial; (iv) the importance of the evidence; and (v) the non-disclosing party's explanation for its failure to disclose the evidence. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,

---

opposing the MSJ within twenty-one (21) days of the Notice. Dkt. 41. Plaintiff did not do so. And, the Fourth Circuit has recognized that, even where no *Roseboro* issues, there is no difficulty where the nonmovant actually responds to the Motion. *See Petros v. Sanitation Dep't*, 993 F.2d 1538, 1993 WL 174158, at *1 n* (4th Cir. May 25, 1993) (noting that the failure to issue a *Roseboro* notice was harmless where the plaintiff responded to the motion); *Brooks v. Mahon*, 33 F.3d 51, 1994 WL 416403, at *1 n.* (4th Cir. Aug. 10, 1994) (noting that the failure to issue a *Roseboro* notice was harmless because "Appellant actually responded").

318 F.3d 592, 596-97 (4th Cir. 2003). Here, there is surprise to Defendant because, despite being a participant in these conversations, Plaintiff never identified these text messages in her Rule 26 disclosures nor in response to interrogatories. Indeed, Defendant reports that Plaintiff did not even provide Defendant with these messages until "***after she filed this Motion***" and two weeks after they were allegedly discovered. Dkt. 50 at 4 (emphasis in original).

Nor is the late disclosure harmless. Even at the time Plaintiff had filed her Motion, discovery had been closed for months and the MSJ had been fully briefed. And nothing in Plaintiff's Complaint indicates that she is predicating her claims on any events *after* December 1, 2023. *Contrast* Dkt. 1 ¶¶ 54-56 (not discussing Thanksgiving shifts and alleging that, on December 1, 2023, "Plaintiff was constructively terminated") *with* Dkt. 48-1 (indicating that Plaintiff was not on the schedule for the weekend after Thanksgiving but was on the schedule for later in December). Where a party lacks an opportunity to cure a deficiency during the discovery period or close in time thereafter, courts recognize that such evidence should be excluded. *See Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539, 552-53 (D. Md. 2019) ("Because Obercian did not have an opportunity to challenge this evidence during discovery and Aerotek has proffered no explanation for its tardiness, the Court will not consider the Spieller Declaration, or the documents referenced in the Spieller Declaration, in resolving this Motion."); *see also Wilkins v. Montgomery*, 751 F.3d 214, 223 (4th Cir. 2014) ("The disclosure was made after the agreed-upon expert disclosure date, after discovery was closed, after Appellee filed a motion for summary judgment, and on the very date set by the court for the filing of motions to exclude experts. It is hard to accept that these events would not serve as a surprise to Appellee, or that Appellee could easily cure such a surprise."). Additionally, because the text messages do not appear to relate to any of the claims

that Plaintiff has raised through her Complaint, the messages do not appear to be important to Plaintiff's case and, additionally, they are unauthenticated.

Finally, Plaintiff's explanation for her non-disclosure is no explanation at all. Plaintiff does not discuss her efforts to locate these text messages earlier – and she knew of their existence because she was a participant in them. Nor does Plaintiff explain how she ultimately "discovered" the texts such that the Court could evaluate whether Plaintiff acted diligently. *See e.g., Certusview Techns., LLC v. S&N Locating Servs., LLC*, 2016 WL 6681181, at *8 (E.D. Va. Feb. 10, 2016) (final factor did not weigh in favor of disclosing party where party failed to explain what measures were taken to locate these documents earlier in discovery). Thus, each of the *Southern States* factors weigh against inclusion of this evidence and the Motion to Supplement will be denied.

Finally, Plaintiff moved for leave to file Cross Motion for Summary Judgment Out of Time. Dkt. 51 ("Out of Time MSJ Motion"). The summary judgment deadline was October 24, 2025. Dkt. 17. Plaintiff originally filed a motion for partial summary judgment but then withdrew that motion. Dkts. 26, 43, 65. Plaintiff withdrew her motion on the basis that: "At the conclusion of discovery, it appears that there is no longer a genuine dispute between the parties warranting the Court's consideration of partial summary judgment at this time. Plaintiff now seeks leave of Court to withdraw her motion in an effort to conserve judicial resources." Dkt. 43 at 1. The Out of Time MSJ Motion was filed on January 15, 2026 – months after the deadline. Dkt. 51. Plaintiff recognizes that her Motion is out of time but argues that good cause exists because the necessity of the motion arises "directly from the Defendant's inadequate discovery compliance and material factual misrepresentations within the record." *Id.* at 1. Plaintiff further asserts that her re-discovery of her own text messages and the "gravity" of such "new evidence would have prompted Ms. Bryan to file her own Motion or Cross-Motion for Summary Judgment." *Id.* at 2.

"When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Judges in this District have has defined excusable neglect as requiring "a demonstration of good faith on the part of the party seeking an enlargement of time and some reasonable basis for noncompliance within the time specified in the rules." *U.S. v. Gulf Ins. Co.*, 225 F.R.D. 526, 528 (E.D. Va. 2005). Factors to consider in making such a determination "include: the danger of prejudice to the nonmovant, the length of delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within reasonable control of the movant, and whether the movant acted in good faith." *Id.* Excusable neglect is found in "extraordinary cases where injustice would otherwise result." *Thompson v. E.I. Dupont de Nemours & Co., Inc.*, 76 F.3d 530, 534 (4th Cir. 1996) (quotation omitted).

Each of Plaintiff's proffered reasons for her delay fail to demonstrate good faith or excusable neglect. Plaintiff first asserts that this Court should "consider the Plaintiff's *pro se* status and unclear allowances outlined in the *Roseboro* notice." Dkt. 51 at 2. Nothing in the *Roseboro* notice pertains to Plaintiff's ability to file her own motion for summary judgment; rather, it merely advises Plaintiff of her ability oppose the MSJ. Moreover, this allegation rings hollow where Plaintiff had *already* timely filed a motion for summary judgment, which she later withdrew. Nor does Plaintiff's *pro se* status excuse compliance with deadlines. *See U.S. v. Beckton*, 740 F.3d 303, 306 n* (4th Cir. 2014) ("Appearing pro se does not relieve a litigant of his obligation to follow legitimate rules."); *see also Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989) ("[*Pro se*] as well as other litigants are subject to the time requirements and respect for court orders without which effective judicial administration would be impossible.").

Plaintiff's argument with respect to alleged disputes in regard to the MSJ likewise fail to excuse her neglect to file her own motion. As Defendant correctly argues, even accepting as true that Plaintiff was surprised by Defendant's reliance on an April 18 date, Plaintiff clearly would have known about the alleged incorrect date in the MSJ *when the MSJ was filed in October 2025*. Yet, Plaintiff waited to file the Out of Time MSJ Motion until January 2026.

Finally, to the extent Plaintiff relies on alleged new evidence or incomplete discovery, she has failed to demonstrate excusable neglect. With respect to the text messages that were the subject of the Motion to Supplement, those messages were always *in Plaintiff's possession* and Plaintiff, as a participant in those conversations, had knowledge of them. Moreover, as discussed *supra*, Plaintiff has not demonstrated that she was diligent in looking for or discovering those text messages. Additionally, although Plaintiff asserts that Defendant made incomplete discovery productions, Plaintiff fails to: (i) identify any request to which Defendant failed to respond; or (ii) indicate that she filed any motion to compel a response to any request. Indeed, as Defendant notes, Plaintiff has now filed her proposed cross-motion for summary judgment *without* the benefit of those documents that Defendant purportedly withheld. In short, Plaintiff has offered no basis for this Court to find any basis for excusable neglect, good cause, or good faith to permit Plaintiff to file her motion for summary judgment out of time. *See B & J Enters., Ltd. v. Giordano*, 329 F. App'x 411, 415 (4th Cir. 2009) ("The Affidavits were untimely—submitted two months after the court's deadline, when B & J's reconsideration request was already ripe for disposition. Furthermore, the Affidavits were presented without any explanation for the delay or an assertion of excusable neglect."); *Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 316 (1st Cir. 1998) ("Given the baldness of the appellants' transgressions, the potential prejudice to the plaintiffs and to the orderly administration of the court's docket caused by the late filings, and the need to deter such conduct,

we think the district court's refusal to entertain the appellants' motions for summary judgment is a concinnous sanction, well within the court's discretion."). And, put in the broader context of Plaintiff's filings, as discussed *supra* and is clear from the docket, Plaintiff's actions within the context of this litigation do not support a finding of diligence, good cause, or good faith. Accordingly, the Out of Time MSJ Motion will be denied.[10]

IV. UNDISPUTED STATEMENT OF FACTS

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56. In additional to Rule 56 and the Local Rules, the Rule 16(b) Scheduling Order was clear that any asserted fact or disputed fact must be "with appropriate citations to the record." Dkt. 21 ¶ 15(f). Defendant largely complied with these directives and Plaintiff attempted to comply but often failed to provide citations to the record.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's statement of undisputed facts; (ii) Plaintiff's Opposition to those facts; (iii) the summary judgment record as a whole; and (iv) documents attached to Plaintiff's motion for partial summary judgment and proposed cross-motion for summary judgment (as appropriate). Given this, the undisputed facts are as follows:

1. In 1997, Defendant hired Plaintiff as a Registered Nurse in Labor and Delivery at Inova Fairfax Hospital, on a full-time basis.

2. When Plaintiff began her employment, Defendant's Labor, Delivery, and Recovery Department ("LDR") was located on one floor of an older building and comprised of a Labor and Delivery area ("L&D"), an Obstetrical Triage area ("OB Triage"), and a pre-operative area ("Pre-Op") and operating rooms ("ORs") for cesarean section ("c-section") deliveries. All areas reported to a single director.

[10] Although Plaintiff's original motion for summary judgment was withdrawn and the Court now denies the Out of Time MSJ Motion, the Court will consider the evidence submitted in support of each in determining whether there are any genuine disputes of material fact with respect to the MSJ.

3. On November 1, 1997, Plaintiff suffered a stroke. After taking medical leave, Dr. Kathleen French cleared Plaintiff to return to work, full time, in LDR.

4. After working PRN,[11] or only as needed, beginning in 2002, while having three children, Plaintiff returned in 2011 to a part-time role at 0.5 of full-time equivalent ("FTE") status, initially working 8 hours on Monday and Friday nights (7 p.m. to 3 a.m.) and 12 hours on Saturday and Sunday nights (7 p.m. to 7 a.m.), every other week.

5. On February 27, 2013, Plaintiff suffered her first generalized seizure. After a second seizure in 2014, Dr. Ruben Cintron diagnosed Plaintiff with epilepsy.

6. On October 27, 2014, Plaintiff requested as a reasonable accommodation to switch from the night shift to day shift to reduce seizure triggers. Defendant granted the request, and Plaintiff began working 11 a.m. to 7 p.m. on Friday, 7 a.m. to 7 p.m. on Saturday and Sunday, and 7 a.m. to 3 p.m. on Monday, and then ten days off.

7. In early 2016, Defendant opened a new Women's Hospital in a new building, in which OB Triage is located on the ground floor and the rest of LDR is on the first floor. Due to the new geographical differences, OB Triage became a separate department that would open as an OB Emergency Department ("OBED") in 2017 or 2018. Defendant divided its LDR staff into separate, specialized departments, each reporting to a different director.[12]

8. Defendant selected Plaintiff to work in the new OB Triage.

9. Although OB Triage/OBED nurses were initially not assigned shifts on L&D, they still performed duties in other areas of LDR. For example, it was a function of the job that, if a patient in OB Triage/OBED was ready to deliver a baby, the assigned nurse in OB Triage/OBED was expected to accompany the patient to L&D or the OR until delivery.[13]

---

[11] "PRN" stands for "*pro re neta*" or "as the need arises."

[12] Plaintiff attempts to dispute the asserted fact, but she largely quibbles with the reason offered for *why* OBED became a separate department. Dkt. 40 at 10. Indeed, Plaintiff asserted largely the same fact in her own withdrawn motion for summary judgment. Dkt. 27 at 4 ¶ 1. The Court modifies the asserted fact to reflect that LDR was divided into "separate, specialized" departments and, so modified, there is no genuine dispute of material fact.

[13] Plaintiff attempts to dispute the asserted fact, but the fact is largely drawn from her own deposition testimony. Dkt. 37-1 at 66 ("Now, that's not to be confused with, though, that all of us, first and foremost, were labor and delivery nurses, so we were still capable of doing obstetrics. Meaning if I had a patient who needed to go up to the OR for an emergency C-Section, I would stay with her in the OR and I would circulate her case, on some occasions. If a patient was actively delivering, I wouldn't just drop her off. I'm expected – I haven't given report. I have to stay and deliver the baby, and that's fine. So we were definitely still expected to know, you know, how to do these things, but all of us did that on a weekly or monthly basis. We did it all the time."). Accordingly, there is no genuine dispute of material fact in this regard.

10. OB Triage/OBED nurses could also be scheduled once every six weeks as a "circulator," a L&D nursing role in charge during a c-section in the OR. [14]

11. Some nurses, including Plaintiff, in OB Triage/OBED were also required to take call (be available to come into the hospital when not scheduled) either in Pre-Op or on L&D, neither of which is located in OB Triage/OBED, once or twice every six weeks. [15]

12. As OBED nurses are required to have 1-2 years of experience in labor and delivery and to be certified in Advanced Cardiac Life Support, fewer nurses were qualified and trained to work in OBED compared to L&D. [16]

13. During the COVID-19 pandemic, there was a "very large" shortage of nurses qualified to work in OBED.

14. As more nurses retired during the pandemic than expected, Defendant found that it needed to cross-train and regularly schedule more nurses to work in OBED to ensure that it had sufficient staff when its regular nurses needed time off for callouts, vacation, holidays, or disability leave. OBED nurses also needed to remain proficient in other areas of LDR to fulfill the function of their jobs as Registered Nurses, including taking call in other LDR

---

[14] Plaintiff attempts to dispute the asserted fact, but again the asserted fact is drawn from her deposition testimony. Plaintiff testified that the "circulator is a registered nurse" who "actually kind of runs the case" and, for a c-section, "if a circulating nurse ever tells everybody they have [to] stop – like the surgeons -- . . . everybody has to stop." Dkt. 37-1 at 19-21. Plaintiff described the circulator role as a distinct role in "labor and delivery" and testified that she was scheduled as circulator "once every six weeks." *Id.* at 78-79. Accordingly, there is no genuine dispute in this regard.

[15] Plaintiff attempts to dispute the asserted fact, but again the asserted fact is drawn from her deposition testimony. Plaintiff testified that she and other OBED nurses were required to take call approximately "[o]nce every six weeks" in either "pre-op call or labor and delivery, slash, OR." Dkt. 37-1 at 74. But Plaintiff did clarify that "[s]ome nurses were allowed not to take call" and that she "didn't mind working in pre-op because that's what I do." *Id.* at 74-75. Accordingly, the asserted fact has been modified to add the word "some, and, so modified, there is no genuine dispute of material fact.

[16] Plaintiff asserts that she "agrees-in-part, disputes-in-part" the asserted fact. Dkt. 40 at 12. But Plaintiff agrees that fewer nurses were qualified to work in OBED, that there were minimum experience levels, and additional certifications required. *Id.* Accordingly, it is unclear what is in dispute. Plaintiff asserts that she disputes the characterization that the positions are equivalent, but Defendant makes no such suggestion here. Thus, there is no genuine dispute of material fact.

areas, and Defendant had learned that eight hours of call was not enough for all OBED nurses to maintain skills, especially as practices and procedures changed. [17]

15. The Women's Hospital leadership made the decision to better train qualified LDR nurses to work in the OBED by setting up a fair and consistent rotation so that LDR nurses in other areas would have the opportunity to learn skills in OBED and so that OBED nurses would be able to maintain their labor and delivery skills. [18]

16. On November 11, 2021, Janet Hooper, then-Assistant Vice President of Nursing, notified staff that Defendant wanted the unit more cross-trained by bringing qualified L&D nurses to OBED and ensuring that OBED nurses' skills remained suitable for all of LDR.

17. After allowing for re-orientation shifts, it became a minimum requirement for nurses assigned primarily to OBED to rotate to L&D once every six weeks.[19]

18. From 2021-2023, Defendant considered L&D, Pre-OP, OR, and OBED to be one unit operationally, once again managed by a single director. [20]

19. The essential functions of a Registered Nurse working on OBED and L&D do not differ. The essential functions are to assess and care for patients in the hospital based on the nurse's training and the patient's needs. In Defendant's view, a Registered Nurse's job

---

[17] Plaintiff attempts to dispute the asserted fact. Plaintiff agrees that LDR nurses needed to be trained in OBED. Dkt. 40 at 13. Plaintiff also cannot dispute what management with Defendant learned about staffing following Defendant, as such assertion is supported by citations to the record. *See* Dkt. 37-2 at 190-91, 278-80. Accordingly, there is no genuine dispute of material fact.

[18] Plaintiff attempts to dispute the asserted fact but arguing that there is a contradiction with the undisputed assertion that there was a shortage in OBED. Dkt. 40 at 14-15. *First*, this is improper argument and not a dispute of fact. *Second*, Plaintiff's argument comports with Defendant's asserted fact – that more L&D nurses needed training to cover OBED positions. Accordingly, there is no genuine dispute of material fact.

[19] Plaintiff attempts to dispute the asserted fact, but the fact is asserted by citation to the record and Plaintiff's dispute is not. *See* Dkt. 37-2 at 280. Indeed, this is consistent with Plaintiff's deposition testimony that she and other OBED nurses were required to take call approximately "[o]nce every six weeks" in either "pre-op call or labor and delivery, slash, OR." Dkt. 37-1 at 74. Accordingly, there is no genuine dispute of material fact in this regard.

[20] Plaintiff agrees-in-part but asserts that other divisions of Inova "claimed LDR and OBED were two different units." Dkt. 40 at 15. And, having reviewed Plaintiff's evidence in support of her own motion for summary judgment, Plaintiff has submitted evidence demonstrating that the units were considered together during this timeframe. *See* Dkt. 52-8 at 35-38 (referring to unit as "OBED/LDR" or "OBED/OB Triage/LDR"). Accordingly, there is no genuine dispute of material fact in this regard.

profile and job duties are the same in all departments of the hospital, which is why provided nursing care to different care areas is part of nursing staffing. [21]

20. On November 21, 2021, the day following Hooper's meeting with OBED nurses, Plaintiff sent a text to at least one nurse in OBED stating that she "really didn't care about transferring to other units, as far as it was the Pre-Op or the OR," but that she "can't work in labor and delivery; it's a seizure waiting to happen. There's lights everywhere." The nurse replied in the text message, "And Sarah, if you can't work on the labor floor because of the strobe lights, how do you think you were able to work in the main ED triage area like you said you wanted to do? You use that as an excuse when you want to. I'm calling you out on that."

21. Plaintiff reported the nurse's comments to Bethany Batres, Director of Operations for LDR, explaining that Plaintiff tells everyone that she has a disorder and that, if she has "flashies," she has to immediately get to patient rooms 7 or 8, or in the sonogram room, Room 9, to lay down in the dark, and she tells them not to call anyone or do anything unless she is not back in five minutes. Plaintiff further explained that, as of November 12, 2021, Defendant had made every accommodation that she had requested, and she had "never felt disrespected for a very real, very painful, very depressing disease, until the nurse's comment that day. She did not reveal the identity of the nurse. [22]

22. In response, Batres suggested that she and Plaintiff talk to Human Resources ("HR"), and Batres contacted Ashley Dengler (neé Pascale), an HR Business Partner, who scheduled a meeting for December 1, 2021. [23]

23. During the meeting, Plaintiff was not asking for any reasonable accommodations, even after having learned that OBED nurses would begin to be scheduled for shifts on L&D. Nonetheless, Dengler sent Plaintiff the ADA policy and request forms if she needed accommodations "down the road." [24]

---

[21] Plaintiff argues whether requiring cross-staffing against departments is compliant with the ADA but does not assert any facts that would dispute Defendant's asserted fact. Dkt. 40 at 17. Moreover, in support of her own out-of-time motion for summary judgment, Plaintiff attached Defendant's job description for a Registered Nurse, which largely tracks the asserted fact here. Dkt. 52-8 at 29. Accordingly, there is no genuine dispute of material fact.

[22] Plaintiff did not identify whether this asserted fact was disputed or not. Because that obligation is on Plaintiff, the Court assumes that the asserted fact is undisputed.

[23] Plaintiff did not identify whether this asserted fact was disputed or not. Because that obligation is on Plaintiff, the Court assumes that the asserted fact is undisputed.

[24] Plaintiff did not identify whether this asserted fact was disputed or not. Because that obligation is on Plaintiff, the Court assumes that the asserted fact is undisputed.

24. Defendant tasked Colleen Radich with scheduling re-orientation shifts in L&D. Plaintiff ran into Radich in the hallway and signed up for a re-orientation shift on December 28, 2021.

25. During her re-orientation shift, Plaintiff told a charge nurse that she may need a safe space to go to, and the charge nurse suggested Room 7. Although the room was not in good shape, Plaintiff did not tell anyone about its condition until she met with the Nurse Manager for L&D, Natalie Doudaklian, and her then-direct supervisor, Dianna Hovmiller, later in the shift.[25]

26. Doudaklian called Plaintiff into the meeting after a charge nurse reported that Plaintiff could not handle certain lights on L&D. Doudaklian recalled that Plaintiff explained that the problem had been the blue delivery lights, and Doudaklian offered to let her go home. Plaintiff declined to go home.

27. After her re-orientation shift, Plaintiff wrote to Hovmiller that "one set [of lights] is bad and I can readjust my seat." She added that the lights "aren't synchronized in two different rooms or triggered at the same time. Maybe they can fix that. I don't know. I'll talk to HR and find out what's reasonable without causing financial hardship."

28. Throughout the Women's Hospital, Defendant uses the same Responder 5 lights system. Thus, the lights that flash blue on L&D are the same lights that may flash blue for emergencies in OBED.[26]

---

[25] Plaintiff asserts without citation to the record that she was told she could work in a position and, when she was not placed in that role, she became tearful. Dkt. 40 at 18. Plaintiff asserts that the response from the charge nurse was "snide and dismissive." *Id.* at 19. This allegation is unsupported by a citation to the record, but, in any event, the Fourth Circuit has held that such "general characterizations of tone" are not relevant to a hostile work environment or constructive discharge claim. *Decoster v. Becerra*, 119 F.4th 332, 340 (4th Cir. 2024). Plaintiff further asserts that her manager and director made fund of Plaintiff in a private text message chain. Dkt. 40-1 at 22-23. But there is no context to the text chain, which is a chat with "Wiki," and which has no associated dates to indicate when the conversation took place. *Id.* In any event, the messages support the asserted fact that, that Plaintiff was sent the ADA paperwork and did not request an exemption. *Id.* ("She didn't want a[n] exemption. . . . Pascale sent her the paperwork twice."). Accordingly, there is no genuine dispute in this regard.

[26] Plaintiff attempts to dispute the asserted fact by alleging that the light system in "LDR is 'cold blue' and 'cold white'" and that the light system in OBED is "baby blue and gray." Dkt. 40 at 20. Plaintiffs unsupported assertion does not establish that "cold blue" and "baby blue" are actually different colors. Moreover, in her deposition, Plaintiff was asked: "But if there's an emergency and it flashes, then does it look the same as on labor and delivery." Dkt. 37-1 at 167. Her response: "Yes." *Id.* Accordingly, there is no genuine dispute of material fact in this regard.

29. Plaintiff did not reach out to HR or to Defendant's engineering department regarding the lights. Plaintiff also did not complete the forms that HR had sent her a few weeks earlier to request an accommodation, nor was she asking for an accommodation at that time.

30. On December 21, 2021, Krystol Large, a service line leader who handled scheduling at the time, sent an email to Plaintiff stating:

> Since transitioning to Oracle, we have been going in and having to validate [that] everyone's status with HR matches their cyclicals/actual hours. Yours was somehow missed. We are having to consistently track any bonus, over, or hours worked over FTE status. So for you, if you want to stay a 0.5 [FTE], we would need to remove the extra shift. You would have the option to pick up extra shifts if/when they are posted/available. Or, if you are wanting to change your FTE to a 0.6, we can accommodate that as it does pose a unit challenge because we are consistently having to schedule a 12-hour person or call in the on-call person to cover the 4 hours on the days you are scheduled for 8 hours. Let me know how you would like to move forward. [27]

31. Plaintiff could have remained a 0.5 FTE and worked only 8 hours on Friday. Instead, she replied that she did not think it prudent to go back to 0.5 FTE status and had "worked out how to make my Fridays, 12-hour shifts." [28]

32. On January 3 ,2022, in response to receiving a proposed 0.6 FTE cyclical schedule, Plaintiff replied, "I cannot work Tuesdays, Wednesdays, or Thursdays (per my divorce agreement; their dad travels during the week and that's why I work all the extra Mondays, Fridays, Saturdays, and Sundays)." She also explained, "I've been asked in the past to add that 7-11 on Fridays but I couldn't. Since you and I talked, I was able to negotiate with their dad with me keeping them Sunday instead of Thursday night."

33. On August 28, 2022, Plaintiff advised Doudaklian and Batres by email that she could no longer work 7-11 a.m. on Fridays because her daughter was back in school. Plaintiff asked to be scheduled in the OR on Mondays, rather than on Fridays, as it would be easier for her to find coverage on the Friday mornings that she needed off if she was scheduled in OBED rather than in the OR. Plaintiff did not state that these requests were related to medical reasons.

---

[27] Plaintiff "acknowledges that an email was sent," which is all that is asserted by Defendant. Dkt. 40 at 21. Plaintiff asserts that there is a typographical error in the email but proffers no basis for this conclusion and Defendant has reported the email accurately. Dkt. 37-11 at 1. Accordingly, there is no genuine dispute of material fact.

[28] Defendant accurately reported Plaintiff's email. Dkt. 37-11 at 2-3. Plaintiff reads into this message that she was in danger of losing her job if she did not agree, but that is not what the email says. Accordingly, there is no genuine dispute in this regard.

34. Likewise in May 2023, Plaintiff again advised Doudaklian that she could not work on Friday mornings due to her legal custody agreement. [29]

35. In October 2022, Defendant selected Jessica Lawrence as the Nurse Manager of OB Triage/OBED, and she became Plaintiff's direct supervisor.

36. On December 5, 2022, Lawrence learned from Plaintiff that Plaintiff has epilepsy. Plaintiff shared that if she feels seizure symptoms, she goes to the break room or patient rooms 7 or 8 in the OBED, though there was no guarantee these rooms would be vacant. Lawrence encouraged Plaintiff to contact HR. [30]

    a. At some point during this conversation, Plaintiff expresses a fear that, if she complained about the lights, she would be terminated and Lawrence acknowledges that it may be a possibility. Dkt. 40-5 at 50.

37. Plaintiff also took a tour of the LDR units with Lawrence. Plaintiff shared that there were no seizure triggers in the OR and that she only needed a safe place to go. Lawrence showed her a dark room with a recliner, which Plaintiff reported was perfect. Although the recliner was not in that room the next time Plaintiff saw the room, she did not notify Lawrence of its absence. [31]

38. Plaintiff also showed Lawrence a clock in the OBED for which Plaintiff regularly contacted engineering to fix as the colon on the clock face would blink. Plaintiff replaced the clock with an analog clock to resolve the issue permanently.

---

[29] Plaintiff attempts to dispute the asserted fact by asserting that she does not have a record of speaking with Doudaklian after March 2023. The deposition testimony, however, supports that this was a conversation that occurred in May 2023. Dkt. 37-1 at 199 ("Q. And that's what you told her in May of 2023, correct? A Yes."). Accordingly, there is no genuine dispute of material fact.

[30] Plaintiff attempts to dispute the asserted fact by asserting that Lawrence was aware of Plaintiff's epilepsy before December 2022, but neither cites any portion of the record in this regard nor provides an earlier date at which Lawrence would have been aware. Dkt. 40 at 24. Plaintiff also points to a portion of Lawrence's deposition testimony in which Plaintiff plays a recording of a conversation between herself and Lawrence. Dkt. 40-5 at 50. Although the full context of the exchange is not clear from the excerpt, in it, Plaintiff expresses a fear that, if she complained about the lights, she would be terminated and Lawrence acknowledges that it may be a possibility. *Id.* The Court has added this additional fact. Accordingly, there is no genuine dispute of material fact in this regard.

[31] Plaintiff attempts to dispute the asserted fact, but Plaintiff does not actually dispute the asserted information. Plaintiff asserts that the room she was shown was in the preoperative and post anesthesia care units (the "PACU"), but this additional information does not appear material. Accordingly, there is no genuine dispute of material fact in this regard.

39. On December 8, 2022, Lawrence contact Bhawna Singh, the HR Business Partner supporting LDR while Dengler was on maternity leave, for Defendant's ADA policy and request forms, and, upon receipt, Lawrence provided them to Plaintiff.

40. On March 7, 2023, Plaintiff noticed that she was scheduled for a shift in the OR on Friday, March 10, 2023, and she sent a text message to Doudaklian asking if Doudaklian had changed her schedule from OBED to OR. Doudaklian stated that she had not changed her shift and that the schedule had been posted that way since January 9, 2023. [32]

41. The next day, on March 8, 2023, Plaintiff contacted Singh in HR, telling her that she had been making verbal requests to "stay in my chair in OBED" that were not being honored. Though, at this point, Plaintiff was not being scheduled in L&D, and she had advised Lawrence that she was "okay" working in the OR.

    a. Although Defendant accurately recounted Plaintiff's deposition testimony regarding this conversation, Plaintiff now concedes that she "never made verbal accommodation requests to her managers or directors." Dkt. 40 at 27.

42. On March 27, 2023, Plaintiff sent an email to Singh and Jeffrey Pratt in HR, to which she attached a letter requesting accommodations. In the letter, Plaintiff explained that there have been changes in her department that could alter her regular work environment and that could present challenges with respect to her seizure disorder.

43. Plaintiff made "two specific requests." First, when not in a patient's room, she requested to "stay at the OBED workstation where IT and Engineering already have configured a workspace specifically for me, and where I am familiar with my potential seizure triggers." She added that she has a safety plan with her team and a nearby safe space to go.

44. Second, she requested to return to her schedule of 8 hours on Friday, omitting that she had elected to take on 12-hour shifts on Fridays in January 2022, and omitting that, after attributing her need to return to 8-hour shifts to her daughter returning to school, she had been permitted to use 4 hours of paid time off on every Friday that she was scheduled since August 28, 2022. [33]

---

[32] Plaintiff concedes the information asserted by Defendant. Dkt. 40 at 25. But Plaintiff asserts that Doudaklian did not provide Plaintiff with an audit to prove her statement and that Plaintiff did not receive such information until discovery. *Id.* But Plaintiff neither attaches such audit or other discovery materials as an exhibit nor attests to what was included within it. Nor does her own motion mention such materials. Accordingly, there is no genuine dispute of material fact in this regard.

[33] Plaintiff attempts to dispute the asserted fact by arguing: "Ms. Bryan was not permitted to use PTO between (approximately) May 15, 2022 and September 15, 2022 per LDR 'rules' regarding time off in the summer." Dkt. 40 at 28. Plaintiff cites no record evidence in support of this and her time sheets, cited by Defendant, reflect that Plaintiff did take PTO during this period.

45. Near the end of her March 27, 2023 letter, Plaintiff claimed that she had been "mocked, yelled at, made fun of, [and] talked [about] behind her back," and she stated that she could not help but believe that, if her requests had been honored on November 12, 2021 or December 1, 2021, the events occurring since then would never have happened.[34]

46. Contrary to the implication of her letter, Plaintiff had not actually made any requests for a reasonable accommodation in November or December 2021.[35]

47. And as for mocking, yelling, making fun of her, and talking about her, Plaintiff just "assumed" that, if people spoke to her about any shift she switched, they were talking about her health. Plaintiff never provided HR with names of anyone mocking her.[36]

---

*See* Dkt. 37-16 at 10-11 (reflecting PTO taken during this period). Plaintiff further asserts that her physician stated that she *must* be given that time off. Dkt. 40 at 28. Not so. Plaintiff's physician only states "if feasible I would be recommended to keep a schedule that allows this request." Dkt. 40-3 at 6. Her physician goes on to state that he recommends that, "*if* she has earned sick leave, vacation leave, disability leave, or [Family Medical Leave Act ("FMLA") leave] available to her for hours scheduled but unworked, she be allowed to use those to accommodate modified work hours on a permanent basis." *Id.* (emphasis added). Accordingly, there is no genuine dispute of material fact in this regard.

[34] Although Defendant accurately cites Plaintiff's letter, Dkt. 37-15 at 4, Plaintiff now asserts that "the requests" referred to were not for accommodations, but for education of staff regarding disabilities, and now agrees that "Plaintiff did not ask for Accommodations on December 1, 2021." Dkt. 40 at 28. Accordingly, there is no genuine dispute of material fact in this regard.

[35] Plaintiff asserts that the requests were for education of her colleagues regarding disabilities and not, as might be implied from her letter, for reasonable accommodations. *Id.* at 28. Again, Plaintiff agrees that "Plaintiff did not ask for Accommodations on December 1, 2021." *Id.* The Court has modified the asserted fact and, as modified, there is no genuine dispute of material fact in this regard.

[36] Plaintiff attempts to dispute the asserted fact, but Defendant accurately cites Plaintiff's deposition testimony. Plaintiff was asked, how she knew that anyone was talking about her health, and she responded, "I guess I don't." Dkt. 37-1 at 285. When asked to explain her remarks about being mocked, Plaintiff responded that she was referring to when coworkers would "aggressively ask me why my shift was scheduled -- or switched, it means that people are talking about it." *Id.* at 286. Plaintiff also agreed that she did not have any evidence that anyone was mocking her behind her back. *Id.* at 287. Further, in response, Plaintiff asserts that she had discussions with HR in July 2023 – but that does not respond to the asserted fact regarding circumstances in March 2023. Dkt. 40 at 29. Finally, Plaintiff points to some unfortunate and hurtful private text messages produced in discovery from Plaintiff's colleagues where those coworkers are frank regarding some of their feelings regarding Plaintiff, but do not refer to Plaintiff's health. Dkt. 40 at 29 (referring to Plaintiff as a "problem team member" and "so manipulative"). Accordingly, there is no genuine dispute of material fact in this regard.

48. Given the nature of Plaintiff's accommodation requests, HR requested additional medical paperwork to specify if the requested accommodations had to be on one unit and to better understand, since there is potential for emergencies, what to do to ensure that Plaintiff was saw and okay to work. For example, if Plaintiff needed to take a patient from OBED to an emergency c-section or x-ray, Defendant needed to know more about any limitations. But despite twice receiving Defendant's ADA policy, and at least once receiving the Physician Certification forms from HR, Plaintiff had not provided any documentation from a physician regarding her requests. [37]

49. Thus, after conferring with Plaintiff's leaders about the requests in April, on May 8, 2023, Dengler wrote to Plaintiff, advising her that Defendant needed additional information and documentation from her physician to understand the nature of her current condition and how her requests for accommodation would enable her to perform the essential functions of her job. Dengler instructed Plaintiff to ask her provider to offer any recommendations to the type of accommodations that would assist her ability to perform the essential functions of her job. [38]

50. On June 3, 2023, Plaintiff provided Dengler with another written request for accommodation, this time on Defendant's form, but she did not include the requested documentation from her physician, nor did she authorize Defendant to contact her physician other than to confirm that she has epilepsy. [39]

51. In all of 2023, including while Plaintiff's requests for accommodation were pending, Defendant did not assign Plaintiff to work on L&D for any shift.[40]

---

[37] Plaintiff attempts to dispute the asserted fact, by noting that her physician provided documentation in June 2023 and in August 2023. Dkt. 40 at 31. Defendant's asserted facts, however, proceed in chronological order and time period referred to in the asserted facts is well before June 2023 – which is mentioned in latter assertions of fact. Plaintiff otherwise fails to cite to any portion of the record. And, in her deposition, Plaintiff acknowledged that, as of May 2023, her doctor had not put anything in writing in regard to her requests. Dkt. 37-1 at 313. Accordingly, there is no genuine dispute of material fact in this regard.

[38] Although Plaintiff disputes the need for the information requested in the email, Plaintiff concedes that she received it. Dkt. 40 at 33. Accordingly, there is no genuine dispute of material fact.

[39] Plaintiff agrees that she did not authorize access to her physician but argues that she provided documentation regarding her epilepsy diagnosis in 2011. Dkt. 40 at 34 (citing Dkt. 2 at 12-13, 16). Argument regarding whether her responses were sufficient does not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact in this regard.

[40] Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence. Defendant relies on Plaintiff's deposition testimony wherein Plaintiff agreed that she did not work any L&D shifts in all of 2023. Dkt. 37-1 at 214. Accordingly, there is no genuine dispute of material fact in this regard.

52. Between August 28, 2022 and March 2023, Defendant continued permitting Plaintiff to use four hours of paid time off so that she did not work more than eight hours on any Friday in 2023. [41]

53. In January 2023, leadership met to evaluate team member performance in 2022. Following guidance from HR, they rated the majority of team members, including Plaintiff, as "Successful," reserving the highest category of "Exceptional" for a few team members who went above-and-beyond in 2022. [42]

54. In April 2023, Lawrence met with Plaintiff to provide her the evaluation reflecting her "Successful" 2022 performance.

    a. During that conversation, Lawrence indicated that, when making the decision in January 2023, leadership provided an "Exceptional" rating to those who sought out the opportunities to float between the units and that, "when you talk about high reliability and performance across job responsibilities in assigned projects, I would say that I know there are extenuating circumstances for coming upstairs and getting on board with getting re-acclimated to LDR and the O.R., but I also think and this is not just you, okay. This is more than one team member. People are in a lot of ways actively avoiding the expectation of working their one shift every six weeks upstairs." Dkt. 40-4 at 113-114.

    b. Lawrence then further explained, "What I'm saying is that there are job expectations that, again, not just you, that people aren't making or aren't reaching because they are not maintaining skills on Labor and Delivery, and in the O.R." *Id.* at 125.

55. In the two prior years, Plaintiff had also received ratings of "Successful" overall for her performance in 2021 and 2020, respectively.

---

[41] Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence. Indeed, even without a citation to the record, Plaintiff's attempted dispute is somewhat contradictory, because she asserts that she was not allowed to use PTO, but then says she was allowed to use PTO if she found coverage for herself. Dkt. 40 at 35. Defendant relies on Plaintiff's deposition testimony wherein Plaintiff agreed that she did not work any 12-hour Friday shifts in all of 2023. Dkt. 37-1 at 251 ("Q: Okay. But there's no Friday during this time where you're not -- where you're being required to come in for 12 hours, correct? A: Correct."). The timecards cited by Defendant also support the asserted fact. Dkt. 37-16. Accordingly, there is no genuine dispute of material fact in this regard.

[42] Plaintiff attempts to dispute the asserted fact, by providing additional context. Accordingly, there is no genuine dispute of material fact, but the Court will provide the additional context.

56. Categorically, Plaintiff's overall score had not been "downgraded" from the overall score she had received in prior years. And, as a result of the "Successful" rating, Plaintiff received a merit increase in pay all three years.

57. Lawrence endorsed Plaintiff for ADVANCE, a professional development opportunity with increased compensation for nurses with Defendant.[43]

58. At certain points during the year, leaders run a report of absences. Gladys Rodriguez-Ayala, who handles time and attendance for LDR, meets with team members who have at least a third occurrence for an Advisement, or coaching conversation.[44]

59. On April 8, 2023, Rodriguez-Ayala met with Plaintiff about her attendance and issued her an Advisement for multiple absences. At the time, Plaintiff was not approved to use any family medical leave for these absences. [45]

---

[43] Plaintiff attempts to dispute the asserted fact, by citing to text messages between Batres and another co-worker. Dkt. 40 at 36. Plaintiff asserts that there is an "obvious delay and attempt to block this endorsement." *Id.* In the text messages, the participants reference the ADVANCE program and wanting direction from legal counsel before determining how to respond. Dkt. 40-1 at 4. The cited text messages do not reflect that there was a delay or an attempt to block Plaintiff's participation in the program and Plaintiff appears to concede that she participated in the program. Accordingly, there is no genuine dispute in this regard.

[44] Plaintiff attempts to dispute the asserted fact, by discussing her own attendance. The asserted fact, however, makes a general statement about Rodriguez-Ayala's role and does not mention Plaintiff. Accordingly, there is no genuine dispute in this regard.

[45] In reliance on Plaintiff's deposition testimony and interrogatory responses, Defendant asserted that this Advisement took place on April *18*, 2023. Dkt. 37-1 at 299. Plaintiff attempts to dispute the asserted fact by arguing that the date was actually April *8*, 2023. Dkt. 40 at 37. The difference in dates also partially forms the basis for the Out of Time MSJ Motion. Dkt. 51 at 3. But, as Defendant noted in opposition to the Out of Time MSJ Motion, in its view, "it makes ***no difference whatsoever***" on which date the conversation occurred and "this Court can accept as true that the Advisement was issued April 8, 2023, rather than April 18, 2023 as transcribed in the deposition transcript." Dkt. 54 at 4 (emphasis in original). Plaintiff does not otherwise dispute this fact and the only additional information Plaintiff asserts is that April 8, 2023 was one day after she had requested FMLA leave. But Plaintiff asserts no FMLA claim here. Accordingly, the Court has modified the date and, so modified, there is no genuine dispute of material fact.

60. Rodriguez-Ayala[46] advised Plaintiff that, if family medical leave was approved retroactively, she would review the occurrences again.[47]

61. Plaintiff also claims that on two or three occasions around this time, people, including Rodriguez-Ayala, questioned her about patient care issues.[48]

62. In May 2023, Plaintiff asked Elyna Thomas, an LPN, to verify expiration date, manufacturer, and patient before Plaintiff administered RhoGAM to a patient.[49]

63. By policy, only a licensed healthcare provider ("LHP"), defined as a registered nurse, APPs, ECMO specialists, and certified perfusionists/transfusionists, may administer and verify blood products.[50]

64. Defendant's Blood Bank considers RhoGAM to be a blood product.[51]

---

[46] In this asserted fact, Defendant switches the order of the names from "Rodriguez-Ayala" to "Ayala-Rodriguez." *Contrast* Dkt. 37 ¶ 59 *with id.* ¶ 60. The Court assumes that this is intended to refer to the same person and that the initial order was correct. Accordingly, the Court will utilize "Rodriguez-Ayala."

[47] Plaintiff attempts to dispute the asserted fact by asserting that her FMLA leave was approved and Rodriguez-Ayala did not revisit the issue. Dkt. 40 at 38. Although the evidence cited by Plaintiff supports that she was awarded FMLA leave (Dkt. 40-2 at 31), that record does not support that the FMLA leave was provided retroactively. *Id.* Indeed, the record shows that as of April 21, 2023, Plaintiff had used "0 hour(s)" of FMLA leave, indicating that it was *not* applied retroactively. *Id.* Accordingly, there is no genuine dispute of fact in this regard.

[48] Plaintiff attempts to dispute the asserted fact, without citation to the record. Dkt. 40 at 38. But the asserted fact is drawn from Plaintiff's deposition testimony. Dkt. 37-1 at 262. Accordingly, there is no genuine dispute of fact in this regard.

[49] Plaintiff does not dispute the asserted fact but asserts that it is misleading. Dkt. 40 at 39. This is not a proper dispute of fact. Plaintiff only cites record evidence to support her assertion that Thomas did not sign disciplinary paperwork related to this incident because she had asserted it was not within her scope of practice. Dkt. 40-2 at 70. This appears irrelevant. Accordingly, there is no genuine dispute of material fact.

[50] Plaintiff asserts that RhoGAM does not fall within such policy but does not cite any portion of the summary judgment record. Dkt. 40 at 39. Accordingly, there is no genuine dispute of material fact.

[51] Although Plaintiff disputes that this is the policy Plaintiff does not provide any citation to Defendant's policy. Dkt. 40 at 39. Plaintiff also asserts that RhoGAM is an "immunoglobulin," but does not explain why this would disqualify it from being a blood product. *Id.* Accordingly, there is no genuine dispute of material fact in this regard.

65. On a Standard Work Document for OBED/OB Triage for RhoGAM Procedure, two Registered Nurses are to verify RhoGAM. [52]

66. Lawrence and Batres discussed the incident in which Plaintiff had Thomas verify RhoGAM, and Batres supported issuing a verbal warning to Plaintiff and to Thomas because the event related to scope of practice and the two team members involved need to know what could be delegated to an LPN and what could not be. A formal discipline form was appropriate because, if it happened again, there could be liability for Defendant, and they needed to have it formally documented. [53]

67. Under Defendant's Progressive Discipline Policy, a verbal warning (unlike a written warning or a final warning) does not restrict team members from transferring or participating in programs. [54]

68. On June 5, 2023, Lawrence issued and documented a verbal warning to Plaintiff for not complying with Defendant's policy. During the meeting, Lawrence also provided Plaintiff with a copy of the policy cited at the bottom of the verbal warning in the "Resources Available" section. [55]

---

[52] The Standard Work Document provides for "Dual [Registered Nurse] verif[ication.]" Dkt. 37-23. Plaintiff disputes that this document was not added to the OBED documentation until after this incident. Dkt. 40 at 40. Plaintiff, however, cites to nothing in the record to support this and the document itself asserts that it was implemented in December 2020. Accordingly, there is no genuine dispute of material fact in this regard.

[53] Plaintiff attempts to dispute whether there would actually be any liability for Defendant but does not dispute the conversation between Lawrence and Batres. Dkt. 40 at 40. Accordingly, there is no genuine dispute of material fact in this regard.

[54] Plaintiff cites a 2021 application for the ADVANCE program to dispute whether she would have been eligible for that program in 2023 after her verbal warning, because the 2021 application said an applicant could not be involved in the "progressive disciplinary process." Dkt. 40 at 41; Dkt. 40-2 at 57. Plaintiff cites no record evidence that the 2023 application had the same language or that a verbal warning is considered part of the "progressive disciplinary process." *Id.* And, in her deposition, Plaintiff suggested that, in June 2023, a verbal warning *would not* have been considered part of the disciplinary process. Dkt. 37-1 at 379. Accordingly, there is no genuine dispute of material fact in this regard.

[55] Plaintiff asserts that the verbal warning form referred to a "Blood Product Verification and Management" policy, and she asserts that there is no such policy. Dkt. 40 at 41; Dkt. 40-2 at 58. But the 2020 Work Standard Document included such a policy. Dkt. 37-23. Accordingly, there is no genuine dispute of material fact in this regard.

69. Lawrence issued the same verbal warning to Thomas, who does not have a known disability and had not requested any accommodations.[56]

70. After Plaintiff received her verbal warning, she sent a text to Thomas advising her: "If you get called into Jess's office about the RhoGAM, do not sign anything. Say, Wait I'm confused. I know I couldn't give the shot, but wasn't aware I couldn't verify right patient, right does, right administration." Plaintiff also stated, "I am already suing them and I no longer give a f*ck."

71. On or around June 15, 2023, and having not worked since she received the verbal warning, Plaintiff requested continuous family medical leave, short-term disability, and "Inova medical leave." Although Plaintiff no longer qualified for family medical leave based on the number of hours she had worked in the preceding twelve months, Defendant granted her leave as an accommodation. [57]

72. Once HR learned that Plaintiff had requested medical leave, in July 2023, Dengler advised Plaintiff that Defendant would remove her from the schedule and, when she was ready to return, they would touch base with her about her letter. At that point, HR would also continue the process of considering any accommodations she needed to return. [58]

73. On August 7, 2023, near the end of Plaintiff's leave, Plaintiff emailed Batres that she would like to return only on weekends and holidays, and, if that was not possible until the next schedule, she would plan accordingly with her doctors. Two days later, Plaintiff added

[56] Plaintiff attempts to dispute the asserted fact by arguing that Thomas was issued her verbal warning a week later. Dkt. 40 at 41. But the verbal warnings issued to each reflect that they were both dated June 5, 2023. *Compare* Dkt. 37-25 (June 5, 2023 warning to Plaintiff) *with* Dkt. 40-3 at 9 (June 5, 2023 warning to Thomas). Accordingly, there is no genuine dispute of material fact in this regard.

[57] Plaintiff attempts to dispute the asserted fact without citation to any record evidence. Plaintiff claims she was not provided with any "Disability Leave," but the asserted fact does not state that she was. Instead, the asserted fact states that she requested disability leave, and the evidence cited by Defendant reflects that Plaintiff was ineligible for FMLA, a determination on short-term disability was pending, and Defendant was providing medical leave for which Plaintiff was "Eligible – Pending Determination." Dkt. 37-27. Accordingly, there is no genuine dispute of material fact in this regard.

[58] Plaintiff attempts to dispute the asserted fact by asserting that the email reflecting this information was sent in July 2023. Dkt. 40 at 43. But Defendant does not assert when Dengler sent the information. Indeed, the evidence cited by Defendant supports that this advice was given in July 2023. Dkt. 37-1 at 355 (referencing an email received from Dengler in July 2023); Dkt. 37-5 at 201-02. Accordingly, the Court has added the date to the asserted fact and, so modified, there is no genuine dispute of material fact.

that, without knowing when they could accommodate weekends only, she did not know what return-to-work date to ask her doctors to recommend.[59]

74. On August 12, 2023, Plaintiff provided Dengler with a letter from Dr. Cintron, dated June 15, 2023, recommending accommodations for Plaintiff. Although Dr. Cintron's office received confirmation that the fax was received on June 28, 2023, HR stated that it had not received it until Plaintiff provided it in August. In her email, Plaintiff also advised Dengler that she would be seeing another physician, Dr. Merkel, on August 14, 2023 to obtain a fitness-for-duty form so that she could return to work.[60]

75. On August 14, 2023, Dr. Merkel signed the fitness for duty form, clearing Plaintiff to return to work on September 17, 2023, initially on weekends.[61]

76. Before Plaintiff could return to work, Plaintiff suffered another seizure on September 4, 2023, and Plaintiff's leave was extended.[62]

77. On September 6, 2023, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC").

78. Consistent with Plaintiff's request to have a safe space to go in the event that she experienced seizure triggers, Dr. Cintron's letter provided:

---

[59] Plaintiff agrees-in-part and disputes-in-part the asserted fact. Dkt. 40 at 43. In this regard, Plaintiff's asserts, without citation to the record, that "Ms. Bryan's physicians were aware that being subjected to harassment on each business day that management would be there, Ms. Bryan should ease back into work on weekends only." *Id.* This does not dispute the asserted fact, which is supported by the summary judgment record. Dkt. 37-28. Accordingly, there is no genuine dispute of material fact in this regard.

[60] Plaintiff attempts to dispute the asserted fact in reliance on an email from Dr. Cintron's office. Although Dr. Cintron's office may have received a fax confirmation, that is not dispositive over whether anyone in HR received the fax. Nonetheless, this is not a material dispute. Accordingly, the Court has modified the asserted fact and there is no genuine dispute of material fact.

[61] Plaintiff attempts to dispute the asserted to clarify that the form provided by Dr. Merkel was the fitness for duty form. The asserted fact has been so modified and, thus, there is no genuine dispute of material fact.

[62] Plaintiff attempts to dispute the asserted fact but cites to no evidence in the record. Plaintiff premises her dispute on the assertion that her "second request for renewed [short-term disability] was initiated in September, 2023 due to a new medication regime-not a seizure." Dkt. 40 at 44. But Defendant does not assert the reason for the extension of the leave. Moreover, the reason is immaterial where it is undisputed that *Plaintiff* requested to extend her leave. Accordingly, there is no genuine dispute of material fact.

> Because of the nature of partial seizure begins, [Plaintiff] needs an appropriately safe, dark place to lay down, in case the seizure progresses to a generalized event, where she could lose consciousness. . . . For this reason, prevention of a generalized seizure is critical, as a safe place to go if one is imminent.

79. Dr. Cintron's letter also recommended a safety plan with her colleagues, referenced his understanding that Plaintiff had requested modifications to her work environment and modified hours, and recommended that she continue to be allowed to use paid time off for shorter shifts to titrate her medication.

80. After receiving Dr. Cintron's letter, Dengler consulted with Batres and Lawrence as to the accommodations LDR could provide. With the assistance of legal counsel and her own leadership, Dengler prepared a letter to grant Plaintiff's requested accommodations. [63]

81. On September 21, 2023, Dengler sent Plaintiff an email to address Plaintiff's concerns regarding the verbal warning by confirming that a verbal warning would not prevent her from participating in the ADVANCE program and to attach a letter granting her requested accommodations. [64]

82. With respect to Plaintiff's request for workspace modifications, Defendant agreed that any personal workspace configurations that had been made for her on OBED/OB Triage would also be made for her in other areas of LDR. [65]

---

[63] Plaintiff attempts to dispute the asserted fact, but the evidence that she cites is not related to the asserted fact. Dkt. 40 at 46. Plaintiff cites Doudaklian's deposition for the proposition that Defendant required Plaintiff to provide a report before having a seizure and failed to explain how she would manage the number of beds in L&D. But although the report and number of beds are mentioned in the deposition, the testimony does not stand for the proposition for which Plaintiff cites it. Dkt. 40-6 at 37, 39. Accordingly, there is no genuine dispute of material fact in this regard.

[64] Plaintiff attempts to dispute the asserted fact without citation to any evidence in the record. Furthermore, Plaintiff's claim that she was no longer eligible for the ADVANCE program because she had not worked enough hours is not material and Plaintiff's claim that she could not participate in the ADVANCE program because of the verbal warning is unsupported. Defendant's asserted facts in this regard are supported by the record. Dkt. 37-32; Dkt. 37-1 at 375. Accordingly, there is no genuine dispute of material fact in this regard.

[65] Plaintiff attempts to dispute the asserted fact, by asserting that such modifications were not possible. Dkt. 40 at 47. But the evidence cited by Plaintiff does not support that such modifications were not possible. Dkt. 40-4 at 69. Accordingly, there is no genuine dispute of material fact in this regard.

83. As for a safe space to go in the event of seizure triggers, Defendant agreed that it could provide that in OBED and other areas of LDR. [66]

84. To continue the interactive process, Defendant would have visited L&D with Plaintiff to designate the room to assign to her as a safe space when she worked on L&D. Defendant would have shown her a "Zen Den," a dark room with a reclining chair, designed for staff to rest; the perinatal loss office, which also is dark and could accommodate recliners; or an open room or classroom on L&D. [67]

85. Once a safe place was selected, Defendant intended to work with a charge nurse for any shift that Plaintiff was assigned in L&D to assign her patient rooms near the safe space and to ensure the safe space was "blocked" or reserved for Plaintiff, including by placing a closed or reserved sign on the designated room. [68]

86. Finally, Defendant granted Plaintiff a modified schedule, explaining that, if an 8-hour shift could not be accommodated in OBED where it was hard to staff an 8-hour shift, Defendant could accommodate it in OB, Pre-OP, and L&D due to the greater number of staff on those units. [69]

87. In sending the letter granting these accommodations, Dengler's cover email indicated Defendant's willingness to continue the interactive process. [70]

---

[66] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Indeed, Plaintiff's only assertion in this regard is: "It was not until 2025 that possible (and possibly acceptable) locations were shared with Ms. Bryan." Dkt. 40 at 47. Thus, Plaintiff has not disputed the asserted fact and there is no genuine dispute in this regard.

[67] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff's argument is that Defendant never told *her* this. That is not a proper dispute to an assertion that was supported by the record. Dkt. 37-2 at 101-03, 258-59; Dkt. 37-5 at 84-87, 188-90, 206. Accordingly, there is no genuine dispute of material fact in this regard.

[68] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff simply argues that Defendant discontinued the interactive process in September 2023. Dkt. 40 at 48. Accordingly, there is no genuine dispute of material fact in this regard.

[69] Plaintiff attempts to dispute the asserted fact but the portions of the record that she cites do not dispute the asserted fact. Defendant cites to a letter sent from Defendant to Plaintiff. Dkt. 37-32 at 6. Plaintiff cites her deposition testimony for the proposition that, when she expressed further concerns, she was told that HR would get back to her. Dkt. 40 at 48 (citing Dkt. 37-1 at 385). But this does not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact in this regard.

[70] Plaintiff does not directly refer to the asserted fact, but the Court assumes that where Plaintiff asserts "Disputed Part 2" with respect to the prior fact, Plaintiff also intended to dispute this fact. In this regard, Plaintiff attempts to dispute that Dengler never did "circle back" to

88. In response to the September 21 email, Plaintiff advised Defendant that the granted accommodations did not meet the needs of her or her physician. First, she explained that she was not asking for Defendant to make accommodations to any workspace on L&D, but to remain in OBED, mentioning control of temperature, sounds, and lighting that were not referenced in her March 27 request for accommodation or in Dr. Cintron's letter.

89. And, although Plaintiff had never seen the proposed safe spaces in L&D, Plaintiff complained that Defendant had not yet told her which space would be designated for her.[71]

90. Finally, Plaintiff alleged that Defendant had misunderstood her request to be for all 8-hour shifts, though she needed no accommodation to work 12 hours.

91. As Defendant believed that it had not denied any request recommended by Plaintiff's physician, on October 2, 2023, Defendant's counsel contacted Plaintiff's counsel regarding the status of the proposed accommodations. In response, on October 16, 2023, Plaintiff's responded by interlineating blue test in the email to "fully and clearly communicate Ms. Bryan's position."[72]

92. Plaintiff's counsel also provided an updated fitness-for-duty form, dated October 4, 2023, that cleared Plaintiff for regular work status on November 18, 2023, with a work schedule of 8 hours on Fridays, and 12 hours on Saturday, Sunday, and Monday, which schedule Defendant had already communicated that it could accommodate.[73]

---

Plaintiff, but the only asserted fact was that Dengler expressed a willingness to do so and Plaintiff cites no evidence in the record other than the cover email cited by Defendant and her own testimony reciting what was in the cover email. Dkt. 32 at 2. Accordingly, there is no genuine dispute of material fact.

[71] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff's argument is that Defendant did not offer to let Plaintiff see these spaces. But Plaintiff does not cite to anywhere in the record where she requested such and, in any event, such request would not dispute the asserted fact which is supported by the record. Dkt. 37-33. Accordingly, there is no genuine dispute of material fact in this regard.

[72] Plaintiff attempts to dispute the asserted fact by citing to an email chain with Dengler. Dkt. 40 at 51 (citing Dkt. 40-3 at 12). Plaintiff asserts that she was directed not to speak through any attorneys. But this does not dispute the asserted facts regarding communications between counsel. Dkt. 37-34. Accordingly, there is no genuine dispute in this regard.

[73] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff argues that Defendant did not ensure that she could work the 11 a.m. to 7:00 p.m. shift on Fridays. Dkt. 40 at 52. But Defendant's asserted fact mirrors Plaintiff's deposition testimony in this regard. Dkt. 37-1 at 391-92 (Plaintiff agreeing that her physician recommended "8 hours on Friday and then 12 on Saturday, Sunday, and Monday"). And the letter, which is attached to Plaintiff's proposed motion for summary judgment, does not refer to any specific shift. Dkt. 52-

93. In addressing the other accommodations granted, Plaintiff's attorney advised: "It is Ms. Bryan's understanding that she needs a predictable space (the same room every shift, rather than a space that might rotate every shift) and 100% dark room without windows and a space to lie down, etc. This only exists on OBED and cannot be provided in Labor and Delivery. I have advised Ms. Bryan to get updated paperwork from her physician, articulating these requirements in detail. I hope she will be able to provide Inova with more detailed recommendations from her physician soon." [74]

94. Understanding that Plaintiff would be submitting updated information from her physician soon, Dengler waited to respond to Plaintiff's September 25, 2023 email until she received such paperwork and could continue the interactive process if Plaintiff needed additional accommodations beyond those already granted. [75]

95. Plaintiff did not send Defendant any updated paperwork from her physician, nor did she follow up with HR. Plaintiff never reached out to her leaders about the schedule as she had done in August when she initially expected to return to work. Between September and November 2023, while on medical leave, Plaintiff looked for alternative, remote positions within Defendant, but she did not pursue the positions that she found. [76]

96. Before her return-to-work date of November 18, 2023, Plaintiff decided she was not comfortable returning to labor and delivery. In December of 2023, Plaintiff reported to her therapist that she had decided to resign from her job. [77]

97. After Plaintiff's counsel's October 16, 2023 email indicating that Plaintiff would submit updated physician information, the next communication Defendant received from or on behalf of Plaintiff was on December 1, 2023, when Plaintiff resigned, effective December

---

12 at 3 ("8 hours on Fridays, 12 hours on Sat/Sun/Mon per usual schedule"). Accordingly, there is no genuine dispute of material fact in this regard.

[74] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Indeed, Plaintiff acknowledges that the asserted information is contained in a "small portion of an email chain between Counsel for Defendant and Ms. Bryan's former counsel." Dkt. 40 at 53. Accordingly, there is no genuine dispute of material fact in this regard.

[75] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Accordingly, there is no genuine dispute of material fact in this regard.

[76] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff asserts that HR told her they would get back to her. But this does not dispute the asserted fact. Plaintiff's other responses to the asserted fact are confusing as Plaintiff asserts that her physician "recommended weekends which were outside of Ms. Bryan's usual schedule" and then leaves blank a portion of the remainder of the sentence asserting leadership did not "like _____." Dkt. 40 at 55. Accordingly, there is no genuine dispute of material fact in this regard.

[77] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Accordingly, there is no genuine dispute of material fact in this regard.

14, 2023. In her letter, Plaintiff included that she appreciated the 27 years she had given to Defendant as we as the "best group of teammates anyone could ask for," and she concluded, "I'd do it all over again."

98. Upon learning of Plaintiff's resignation, Defendant's counsel wrote to Plaintiff's counsel, explaining that Defendant had been waiting for additional physician information she had promised when it received Plaintiff's resignation. Defendant's counsel confirmed that Plaintiff had not been discharged, that Defendant stood ready to continue the interactive process, and that Plaintiff was eligible for rehire. [78]

## V. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "[A] party opposing summary judgment may not simply rest on the allegations of his complaint but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

[78] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Plaintiff asserts: "Counsel for Inova allegedly sent this email to an attorney who did not work at the law firm Ms. Bryan was represented by." Dkt. 40 at 56. The email chains reflect: (i) that, on September 19, 2023, Defendant's counsel reached out to two attorneys at the firm representing Plaintiff; (ii) that, on October 16, 2023, a different attorney from the firm responded to Defendant's counsel indicating that one of the individuals previously included on the chain had left the firm and substantively responded to Defendant's email; and (iii) that, on December 29, 2023, Defendant's counsel reached out to the same attorney from that law firm, who had previously communicated the prior attorney's departure, to report that Defendant remained willing to engage in the interactive process. Dkts. 37-34, 37-36. Accordingly, there is no genuine dispute of material fact in this regard.

## VI. ANALYSIS

Plaintiff raises claims of: (i) failure to accommodate under the ADA and the VHRA (Counts 1 and 3); (ii) retaliatory hostile work environment under the ADA and the VHRA (Counts 2 and 3); and (iii) retaliatory constructive discharge under the ADA and VHRA (Counts 2 and 3). Because the ADA and the VHRA are "substantively identical statutes," the Court analyzes the ADA and VHRA claims together. *See Rock v. E. Gas Transmission & Storage Inc.*, 2025 WL 1812899, at *4 (E.D. Va. July 1, 2025) (citing *Wash. v. Offender Aid & Restoration of Charlottesville-Ablemarle, Inc.*, 677 F. Supp. 3d 383, 399 n. 12 (W.D. Va. 2023)). Accordingly, the Court addresses each group of claims in turn.[79]

### A. Failure to Accommodate

To prevail on a claim that Defendant failed to provide Plaintiff with a reasonable accommodation, Plaintiff must establish: (i) that she had a disability for purposes of the ADA; (ii) that her employer knew of her disability; (iii) that a reasonable accommodation would permit Plaintiff to perform the essential functions of her job; and (iv) that her employer refused to make the accommodation. *See Wirtes v. City of Newport News*, 996 F.3d 234, 238-39 (4th Cir. 2021). A "reasonable accommodation" includes a "[m]odification[ ] or adjustment[ ] to the work environment, or to the manner or circumstances under which the position held or desired is

[79] As an initial matter, Plaintiff asserts that Defendant's motion must be denied because "she was employed by Inova Health System . . . , an agent of Inova Health Care Services, not Inova Health Care Services itself." Dkt. 40 at 5-6. But the identity of Defendant has been clear since May 2025, when Defendant answered the Complaint as "Defendant Inova Health Care Services d/b/a Inova Health System." Dkt. 13. Indeed, Plaintiff's filings reflect a similar styling. Dkt. 40 (caption referring to "Inova Health system d/b/a INOVA"). As the record reflects, however, Inova Health System "is a trade name and not a legal entity that employs nurses like Ms. Bryan." Dkt. 42 at 1 (citing Dkt. 42-38). Plaintiff cites no authority for her contention that summary judgment should be denied on this basis and Fourth Circuit authority holds otherwise. *See Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999) (recognizing that "the misnomer of a corporation in a notice, summons . . . or other step in a judicial proceeding is immaterial"). Accordingly, the Court does not find this argument persuasive.

customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Once an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an "interactive process" to determine the appropriate accommodation under the circumstances. 29 C.F.R. § 1630.2(o)(3); *see also Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311-12 (3d Cir. 1999) (finding that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith"); *Haneke v. Mid–Atl. Cap. Mgmt.,* 131 F. App'x 399, 399-400 (4th Cir. 2005) (unpublished) (finding that "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation"). As the Fourth Circuit has explained, "the ADA requires accommodating 'known . . . limitations, not known disabilities." *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 574 (4th Cir.), *cert. denied*, 146 S. Ct. 367 (2025). Thus, if "an employee has a disability which causes limitations that interfere with work, and the employer knows it, then the employer must try to accommodate"; but "if any link in that logical chain is missing, no duty arises, and there's no liability." *Id.* The interactive process "helps employers to make that threshold call" and to determine whether "a need for . . . accommodation exists." *Id.* at 575. And "if the employee prevents the employer from understanding her disability, then the employer's duty never arises, and the employee's claim fails." *Id.* And, as a part of this interactive process, "the employer may require that the employee furnish medical documentation demonstrating that the accommodation is required." *Katz v. Garland*, 2023 WL 11990807, at *7 (E.D. Va. Mar. 16, 2023); *Boone v. Bd. of Governors of Univ. of N. Carolina*, 395 F. Supp.3d 657, 671 (M.D.N.C. June 17, 2019) (finding

defendant not responsible for breakdown of interactive process where plaintiff failed to provide medical information).

Here, Defendant does not dispute the first three elements of the *prima facie* case, and the focus of the argument is whether Defendant refused to make any reasonable accommodation. Dkt. 37 at 20. As Plaintiff conceded in her deposition testimony, she did not make any requests for accommodations in 2021 as asserted in her March 2023 letter. *See* Dkt. 37-1 at 288 (testifying, "you are right that I did not request anything" in reference to two discussions in November and December 2021). Nor does the summary judgment record reflect that Plaintiff made any requests for accommodation in 2022. Thus, the proper framing for the interactive process begins in March 2023, when Plaintiff sent her first letter requesting accommodations. Dkt. 37-15. That documents makes two requests for accommodations: (i) to stay at an OBED workstation when not in a patient's room, because the workstation had been configured by IT and she had a safety plan and safe room in place; and (ii) to return to her prior schedule of working an 8-hour shift on Friday before transitioning to 12-hour shifts from Saturday to Monday. *Id.* That March 27, 2023 request did not include any documentation from a physician. *Id.*

Defendant then reviewed the request and, a few weeks after the request was originally made, Defendant asked Plaintiff to provide medical documentation related to the accommodation. Dkt. 37-17. To the extent Plaintiff suggests that this weeks-long interval itself establishes a breakdown in the interactive process, the Fourth Circuit has rejected such arguments. *See Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2023) (holding, in a Rehabilitation Act case, that "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support" that there was a denial of the request). And, in the interim period, Plaintiff was able to receive the accommodations she requested – remaining in OBED and a Friday 8-hour shift.

Dkt. 37-1 at 214, 247, 251, 254; Dkt. 37-16; *Marshall v. Univ. of Md. Med. Ctr.*, 2020 WL 5106788, at *7 (D. Md. May 6, 2026) (in considering a delay, courts "consider the length of the delay, the reason for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request").

In June 2023, Plaintiff made the same requests for accommodations but did not include the medical documentation that Defendant had requested. Dkt. 37-18. As Plaintiff acknowledges, in that letter, when Plaintiff had inquired about the status of her requests for accommodations, she had been told that her "leaders were 'working with HR,'" which supports that Defendant was reviewing the requests and then determined that it needed additional medical information regarding the specific accommodations. *Id.* at 2. Thereafter, Plaintiff requested medical leave (for which she was not eligible) and short-term disability and Defendant provided her with leave until a determination regarding her short-term disability request was made. Dkt. 37-27; Dkt. 37-7 ¶ 8. Plaintiff was advised that, as a result of her leave, she would be removed from the schedule and that, when she was ready to return, HR would consider any additional accommodations that she would need to return. Dkt. 37-1 at 355-56; Dkt. 37-5 at 201-02. Thus, again, Defendant provided Plaintiff with an interim accommodation. *See Pratt v. Science Applications Int'l Corp.*, 2024 WL 4170682, at *12 (E.D. Va. Sept. 11, 2024) ("Plaintiff does not put forward any facts indicating that she objected to being placed on leave as an interim accommodation."); *Saraceni v. Retting*, 2024 WL 1329033, at *21 (N.D.N.Y. Mar. 28, 2024) (rejecting reasonable accommodation claim where Plaintiff was dissatisfied with an interim accommodation and then retired from employment).

Plaintiff asserts that her doctor provided documentation to Defendant at the end of June 2023 and that Defendant did not respond to that documentation. *Contrast* Dkt. 40-2 (asserting letter faxed June 28, 2023) *with* Dkt. 37-29 (indicating that no paperwork received by Defendant

on August 10, 2023).[80] But, even taking the evidence in the light most favorable to Plaintiff that the letter was faxed on June 28, 2023, the Fourth Circuit has recognized that there is no breakdown in the interactive process attributable to the employer where each party was under the impression that they were waiting on the other and neither took steps to follow up. *See Murphy v. Cnty. of New Hanover*, 2021 WL 4704780, at *2 (4th Cir. Oct. 8, 2021) (finding no bad faith failure to engage in interactive process where employer neglected to attach a form to an email and plaintiff failed to follow up for weeks); *Doe v. Balt. City Bd. Sch. Comm'rs*, 2026 WL 1242969, at *9 (D. Md. May 6, 2026) (finding that employer's failure to follow up does not constitute a breakdown in the interactive process where plaintiff also failed to follow up).

On August 7, 2023, Plaintiff reached out to Defendant to inquire about returning to work and the miscommunication regarding the June 2023 letter was discovered. Dkts. 37-28, 37-29. Plaintiff thereafter submitted the June 2023 letter from Dr. Cintron and an August 14, 2023 letter from Dr. Merkel. Dkts. 37-29, 37-30. Those letters did *not* state that Plaintiff could not work in L&D, but confirmed a "recommendation" that Plaintiff: (i) have a safety plan with her coworkers; (ii) have a safe, dark place to lay down; and (iii) "if feasible," that she keep a schedule that permits her to use "sick leave, vacation leave, disability leave, or FMLA" to obtain a modified schedule. Dkt. 37-29 at 8.[81] Having received that email, Defendant consulted with attorneys and leadership

---

[80] At various points, Plaintiff suggests that the letter was sent on June 16, 2023. Dkt. 40 at 78. However, Plaintiff's own evidence does not support that the letter was provided any earlier than June 28, 2023. *See* Dkt. 40-2 (indicating that the letter was faxed on June 28, 2023). Moreover, as discussed earlier, faxing the letter on June 28, 2023 does not mean it was received at that time.

[81] Indeed, Dr. Merkel only recommended the proposed weekend schedule for "6 weeks" and stated that she could return to work with a "safety plan for duration" and "safe place & monitoring." Dkt. 37-30. Thus, Dr. Merkel did not include the same request for permanent 8-hour Friday shift.

and prepared to grant the accommodations given Plaintiff's anticipated return to work on September 17, 2023. Dkt. 37-31.

Before further communication was had regarding the requested accommodations for Plaintiff's return to work, Plaintiff suffered a seizure and made a new request for leave, which Defendant granted. Dkt. 37-1 at 369 (referring to September 4 seizure); Dkt. 37-7 ¶ 9 (indicating leave was extended and approved through November 18, 2023). After granting the request for extended leave, on September 21, 2023, Defendant sent Plaintiff a letter granting her requests for accommodations. *See* Dkt. 37-32. Although Plaintiff's letters from her doctors generally supported a need for a "safe place" and a modified schedule (Dkts. 37-29, 37-30), Plaintiff clarified at the end of September 2023 that her "request is to be assigned to work in the OBED." Dkt. 37-33.[82] Plaintiff also clarified that she wanted to be assigned four 12-hour shifts, but to use 4 hours of PTO for every Friday shift and that the "safe space" must be the same every shift. *Id.* As courts recognize, where a need for a particular accommodation is not obvious and where the medical documentation fails to provide adequate support for the particular accommodation, summary judgment in favor of the employer may be appropriate. *See Kelley v. Mayorkas*, 694 F. Supp. 3d

[82] The Court assumes without deciding for purposes of this opinion that working in L&D was not an essential function of Plaintiff's job. Nonetheless, this does not mean that "an employer must *always* reallocate nonessential job functions in order for a given accommodation to be reasonable." *Tartaro-McGowan v. Inova Home Health, Inc.*, 91 F.4th 158, 167 (4th Cir. 2024) (emphasis in original). In *Tartaro-McGowan*, the Fourth Circuit held that, in the circumstances of COVID-19, all staff were required to "assist with field visits given the shortage of field nurses." *Id.* at 168. The Fourth Circuit held that, given those circumstances, "a rational jury could not conclude that Defendants acted unreasonably in denying Tartaro-McGowan's request to be totally exempt from performing direct patient care field visits." *Id.* So too here, it is undisputed that there were not enough OBED-qualified nurses and, after the pandemic, Defendant determined to engage in more cross-staffing between the LDR departments to ensure it had enough qualified nurses in case of similar circumstances. That Plaintiff did not want to work in L&D does not make Defendant's requirement unreasonable where it took steps to accommodate her work there and where no physician letter indicated that Plaintiff could *only* work in OBED.

715, 726-27 (E.D. Va. 2023) (finding "there is no dispute of material fact that the plaintiff failed to provide adequate medical documentation in support of his request for accommodation"). Moreover, courts have held that an employer is not required to "provide[] the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015). Rather, where an "employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses the 'ultimate discretion' over these alternatives." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020). Here, Plaintiff has provided no medical documentation suggesting that the proffered accommodations was insufficient. Moreover, Plaintiff never attempted to utilize such accommodations to be able to know whether it was insufficient (as she suggests). *See Tartaro-McGowan*, 91 F.4th at 171 ("But having never tried to perform a direct patient care field visit using the accommodation made available to her, Tartaro-McGowan can offer only vague conjecture that Defendants' proposed solution was not viable.").

Defendant reached out to Plaintiff's counsel and was advised that Plaintiff believed that these additional accommodations were necessary and that Plaintiff's counsel had advised Plaintiff to provide additional medical documentation. Dkt. 37-34. Plaintiff did not submit such additional paperwork and the next communication from Plaintiff to Defendant was her submission of her resignation. Dkt. 37-35. Additionally, Defendant's final communication made clear that it was willing to renegotiate the process with Plaintiff and that she was available for rehire. Dkt. 37-36. Thus, the summary judgment record demonstrates that it was *Plaintiff* who ended the interactive process and *not* Defendant. Accordingly, no reasonable juror could find that Defendant denied

Plaintiff a reasonable accommodation on this summary judgment record and summary judgment will be granted in favor of Defendant in this regard.[83]

B. Retaliation/Retaliatory Hostile Work Environment[84]

A discrimination or retaliation claim under on the civil rights statutes is generally analyzed within the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish retaliation, a plaintiff must show that she engaged in a protected activity and that the employer took an adverse employment action against her because of that protected activity. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022). To establish a retaliatory hostile work environment, a plaintiff must demonstrate that the asserted retaliatory conduct was (i) unwelcome; (ii) sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination; and (iii) can be attributed to the employer. *Id.* at 218. If a plaintiff establishes a *prima facie* case, then the

[83] Plaintiff suggests that the proffered accommodations were unreasonable because Defendant sought to have Plaintiff provide a patient handover before leaving her post if she felt at risk of a seizure. Dkt. 40 at 61. In the first instance, Plaintiff's letter from Dr. Cintron indicates that "Ms. Bryan is fully aware with warning symptoms implying partial seizure activity," that she is "aware of her potential seizure triggers and can communicate if she feels vulnerable," and that, based on this awareness, she "has no physical or intellectual deficits that preclude her from being a nurse." Dkt. 37-39 at 8. Based on this information, Defendant suggested that when "trigger signs" occur, Plaintiff should go to the safe room provided and that Plaintiff should do a handoff "to maintain patient care and patient safety." Dkt. 37-32 at 6. Plaintiff asserts that this requires her to give a report "while she was experiencing a seizure." Dkt. 40 at 62. Not so, pursuant to the letter from Plaintiff's own physician, Plaintiff experiences warning signs and can communicate. Moreover, if Plaintiff is unable to complete a handoff, that would appear to be a patient safety issue that would may impact whether she can perform essential functions of her job. Accordingly, the expectation that Plaintiff provide a patient handoff if she begins experiencing triggers, is not unreasonable and is in line with her physician's description of her ability to perform the essential functions of her job.

[84] Although it is not clear from her Complaint, in Opposition, Plaintiff now contends that she is asserting both a retaliation claim and a retaliatory hostile work environment. Out of an abundance of caution, the Court addresses both claims.

defendant has an obligation to produce a legitimate, non-retaliatory reason for its actions and, if so, the burden shifts back to the plaintiff to establish pretext. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). An employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and is a burden of production. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). A plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000).

Here, Plaintiff did not engage in any protected activities until March 2023 when she made her request for accommodations. *See* Dkt. 37-1 at 288 (testifying, "you are right that I did not request anything" in reference to two discussions in November and December 2021); Dkt. 37-15 (March 2023 request). Thus, to constitute retaliation, an adverse action must have taken place *after* the March 2023 request. Plaintiff identifies the following adverse actions: (i) the revocation of her modified hours in January 2022; (ii) the annual evaluation of "successful" rather than "exceptional"; (iii) the April 2023 counseling for attendance violations; and (iv) her verbal warning regarding RhoGAM. Dkt. 40 at 77-78.[85] Plaintiff cannot establish a *prima facie* case with respect to any of these alleged adverse actions.

*First*, the modification of her hours in January 2022 cannot be retaliation because Plaintiff had not yet engaged in protected activity. *See Manguiat v. Bd. of Educ. of Prince George's Cnty.*, 2015 WL 2376008, at *9 (D. Md. May 18, 2015) (stating that "because the alleged retaliation took place before [the plaintiff] engaged in protected activity there can be no causal connection

[85] To the extent that Plaintiff conclusorily asserts that "[t]here were no less than five (5) disciplinary actions or accusations" made against her, Plaintiff fails to cite any portion of the record to support the existence of such discipline. Accordingly, such unsupported allegations are insufficient to defeat summary judgment.

between the two") (citing *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (affirming summary judgment where the "actions that led to [the plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [the defendant's] activity was motivated by [her protected activity]")).

*Second*, Plaintiff's complaint regarding her annual evaluation fails for the same reason. As the undisputed record on summary judgment demonstrates, leadership made the decision to rate Plaintiff "Successful" during their January 2023 meeting. Dkt. 37-37 ¶ 4 ("During the January 2023 meeting, we rated Ms. Bryan 'Successful' along with the majority of her team members."); Dkt. 37-7 ¶ 6. It is of no import that this decision was not *conveyed* to Plaintiff before her protected activity where the undisputed summary judgment record demonstrates that the decision was *made* before the protected activity. *See, e.g., Howell v. Bluefield Reg'l Med. Ctr., Inc.*, 2008 WL 2543448, at *3 (S.D. W. Va. June 23, 2008) (citing cases).

*Third*, the undisputed factual record at summary judgment does not establish that the attendance counseling was materially adverse. Plaintiff does not deny that she was absent[86] and does not assert that there were any adverse consequences from the counseling that she received. As courts recognize, an action only qualifies as retaliation where it was "'materially adverse,' meaning that it 'creates significant harm.'" *Merchant v. City of Roanoke*, 2026 WL 1602933, at *4 n. 2 (W.D. Va. June 4, 2026) (citing *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 357 (2024)). Because there was no significant harm flowing from the counseling, it does not constitute a material adverse action. *Finally*, Plaintiff asserts that her verbal warning constitutes an adverse action. It does not for the same reason that the counseling did not qualify – there was no significant

[86] And the undisputed summary judgment record reveals that leave that was later approved did not apply retroactively to excuse those missed days. *See* Dkt. 40-2 at 31 (indicating 0 hours used, such that leave could not have been applied retroactively).

harm that flowed from it. The undisputed record on summary judgment reveals that a verbal warning does not restrict or preclude employees from transferring or participating in programs. *See* Dkt. 37-1 at 378-379 (conceding that the progressive discipline policy does not impose restrictions where a verbal warning is given); Dkt. 37-7 ¶ 7; Dkt. 37-32 (confirming that verbal warning does not preclude participation in ADVANCE). Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation.

Even if Plaintiff could establish a *prima facie* case with respect to the counseling or the verbal warning, Defendant has asserted a legitimate, non-retaliatory reason for the discipline (violation of a policy). Dkt. 37-25 (verbal warning referring to resources available); Dkt. 37-23 (standard of work policy for RhoGAM); Dkt. 37-2 at 219-222; Dkt. 37-1 at 301 (conceding leave had not yet been approved at time plaintiff was absent). In response, Plaintiff fails to establish pretext. Although Plaintiff asserts without citing the record that no policy on RhoGAM administration exists, the undisputed summary judgment record does not support her arguments in this regard. Dkt. 37-23 (standard of work policy for RhoGAM); Dkt. 37-2 at 202-03 (testifying that policy exists and why formal warning was necessary). Moreover, Thomas, who is not alleged to have engaged in a protected activity, also received a verbal warning for the same incident. Dkt. 37-1 at 322-23 (acknowledging that Thomas received the same verbal warning). With respect to the attendance counseling, Plaintiff asserts that the missed dates were "actually taken using FMLA." Dkt. 40 at 37. But although the leave was approved on April 21, 2023, no time was applied retroactively to cover the days alleged to be missed. Dkt. 40-2 at 31. Accordingly, no reasonable juror could find in favor of her retaliation claim.

With respect to a retaliatory hostile work environment, plaintiff fails to establish that she established retaliatory harassment or that any such harassment was severe or pervasive. As

discussed above, the alleged retaliatory actions that Plaintiff asserts are not materially adverse, nor does the undisputed summary judgment record establish that they were retaliatory. Rather, Plaintiff was subject to the same disciplinary process as other employees – like Thomas. *See Barnhill v. Bondi*, 138 F.4th 123, 141 (4th Cir. 2025) (finding that the acts complained of were "no different than ones 'all employees experience' when they are alleged to have engaged in misconduct"); *Hakeem v. Mayorkas*, 2025 WL 310123, at *8 (E.D. Va. Jan. 27, 2025) (holding that "ordinary personnel decisions" are not actionable retaliation). Plaintiff asserted in her March 2023 complaint that she was "mocked, yelled at, made fun of," Dkt. 37-15 at 4, but the summary judgment record does not bear that out because, as Plaintiff conceded in deposition, she was basing that statement on individuals simply asking why she switched a shift and she agreed that she could not point to any particular incidents where she experienced that, Dkt. 37-1 at 286-87 (agreeing "you don't have any actual evidence"). And, to the contrary, in her resignation email, Plaintiff asserted that she had "the best group of teammates anyone could ask for." Dkt. 37-35.

To the extent Plaintiff perceives her co-workers private text messages regarding her as harassing, the Court understands that some of the messages were hurtful, but the summary judgment record does not support that they were retaliatory where they came before Plaintiff's protected activity. *See, e.g.,* Dkt. 37-1 at 13-16 (messages from 2019); *id.* at 24 (messages from 2022); *id.* at 27 (messages from 2022). Because of the presentation of these messages by Plaintiff, the dates on the messages are often unclear, but to the extent any such messages came after her protected activity, the summary judgment record does not support that they were harassing because Plaintiff was not aware of such messages. Dkt. 40 at 29 ("In Discovery, it was made painfully clear that Inova Health System is, indeed, a very hostile place to work."); *see Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 369 (4th Cir. 2022) ("Statements or acts of which a plaintiff was unaware

. . . cannot show that a reasonable person would perceive his environment as objectively hostile at that time."); *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000) ("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004) (same). In any event, such comments were neither severe nor pervasive enough to alter Plaintiff's terms and conditions of employment. Thus, summary judgment in favor of Defendant is also appropriate in this regard.

C. Constructive Discharge

A constructive discharge claim imposes a higher bar than a hostile work environment claim. A proponent of such a claim must establish that her conditions were objectively intolerable. *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 235 (4th Cir. 2022). In this regard, a Plaintiff must show that her "working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Egan v. Ballantyne Country Club*, 2026 WL 377867, at *3 (W.D.N.C. Feb. 11, 2026). Here, Plaintiff appears to rest her constructive discharge claim on her failure to accommodate claim and her retaliatory hostile work environment claim; each of which, as discussed *supra*, fails. Because the claims upon which her constructive discharge claim is based fails, so too does Plaintiff's constructive discharge claim.

In any event, the summary judgment record does not reflect that Defendant failed to engage in the interactive process (indeed most of Plaintiff's requests for accommodation were granted) or that Plaintiff was subject to harassment, let alone harassment so severe that one would have felt compelled to resign. Importantly, for the last few months of her employment, Plaintiff was not even in the work environment – she took leave in June 2026 and never returned to work – thus, even assuming that Plaintiff experienced such harassment, it is unclear how any alleged

harassment in June could compel her resignation in December. This is particularly true where Plaintiff noted her "great teammates" and that she would "do it all over again" in her resignation letter. Dkt. 37-35; *see Evans v. Int'l Paper Co.*, 936 F.3d 183, 194 (4th Cir. 2019) (finding no constructive discharge where plaintiff noted that her employment was "on the whole, satisfying and productive"). With respect to the interactive process, the summary judgment record establishes that it was Plaintiff who abandoned it, but, in any event, Defendant remained willing to work with Plaintiff to provide accommodations. *See Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) (holding that courts should not view every failure to accommodate as a constructive discharge); *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) ("Manning's choice to resign was 'grossly premature' . . . a reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her."). Accordingly, no reasonable juror could find that Plaintiff was constructively discharged and summary judgment in favor of Defendant is appropriate in this regard.

D. VHRA 10-day Timeframe

Plaintiff also appears to premise her VHRA claim in Count 3 on the Defendant's alleged failure to "initiate a good faith, interactive process upon determination of need for accommodation within 10 days." Dkt. 1 ¶ 75. Plaintiff misreads the applicable statute. VA. CODE § 2.2-3905.1(C) provides that an employer is required to most information regarding an employee's right to a reasonable accommodation and to provide such information to: (i) new employees upon commencement of their employment and (ii) any employee within 10 days of such employee's providing notice to the employer that such employee has a disability. Plaintiff does not assert that she did not receive such information when she provided notice of her epilepsy in 2014. Dkt. 37-3. Moreover, in 2021 and 2022, when Plaintiff mentioned concerns that she had, Plaintiff was

provided with such information within a few days. Dkts. 37-8, 37-13. Moreover, as Defendant correctly notes, the ten-day requirement is not listed as one of the bases pursuant to which a plaintiff may sue. *See* Va. Code §§ 3904, 3905, 3905.1(B). Thus, on this summary judgment record, Plaintiff has not established that the ten-day provision has been violated and, even if it had, the VHRA does not provide a cause of action premised on the violation of that provision.

## V. CONCLUSION

In short, the MSJ is properly before this Court. The summary judgment record establishes that no reasonable juror could find for Plaintiff on any of the claims that she asserts and, therefore, the MSJ will be granted. Plaintiff's various motions to amend and to supplement are untimely and will be denied.

Accordingly, it is hereby ORDERED that the Motion to Amend (Dkt. 56) is DENIED; and it is

FURTHER ORDERED that the R&R (Dkt. 64) is APPROVED and ADOPTED; and it is

FURTHER ORDERED that Plaintiff's Objection (Dkt. 66) is OVERRULED; and it is

FURTHER ORDERED that Plaintiff's Motion to Remand (Dkt. 73) is DENIED; and it is

FURTHER ORDERED that Plaintiff's Second Motion to Amend (Dkt. 78) is DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion to Correct (Dkt. 45) is DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion to Supplement (Dkt. 48) is DENIED; and it is

FURTHER ORDERED that the Out of Time MSJ Motion (Dkt. 51) is DENIED; and it is

FURTHER ORDERED that the MSJ (Dkt. 36) is GRANTED; and it is

FURTHER ORDERED that Defendant is entitled to summary judgment on each of Counts 1, 2, and 3; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on each count of the Complaint; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

To appeal this decision, Plaintiff must file a written notice of appeal with the Clerk of Court within 30 days of the date of entry of this Order. A notice of appeal is a short statement indicating a desire to appeal, including the date of the order that Plaintiff wants to appeal. Plaintiff need not explain the grounds for appeal until so directed by the court of appeals. Failure to file a timely notice of appeal waives Plaintiff's right to appeal this decision.

It is SO ORDERED.

Alexandria, Virginia
September 14, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge